**J.S.G. BOGGS, Plaintiff,**

**v.**

**Eljay BOWRON,[1] Director, United States Secret Service, Lloyd M. Bentsen, Secretary of the Treasury, Janet Reno, Attorney General, Defendants.**

**Civ. A. No. 93–1845 (RCL).**

**United States District Court, District of Columbia.**

**Dec. 9, 1993.**

1. This case was originally brought against John W. Magaw, in his capacity as Director of the United States Secret Service. On December 7, 1993, Eljay Bowron became Director of the Secret Service. "When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, ... the officer's successor is automatically substituted as a party. Proceedings following the substitution shall be in the name of the substituted party...." Fed.R.Civ.P. 25(d)(1). This court hereby orders substitution of the aforementioned party.

Kent A. Yalowitz, Arnold & Porter, New York City, for plaintiff.

Susan A. Nellor, Asst. U.S. Atty., Civil Div., Washington, DC, Maravin Speed, Office of the General Counsel, U.S. Secret Service, Washington, DC, for defendants.

MEMORANDUM OPINION

LAMBERTH, District Judge.

Plaintiff, a visual and performance artist, challenges the constitutionality of provisions of the federal anti-counterfeiting statutes, requesting declaratory and injunctive relief.[2]

---

**2.** No one in this case questions the power of Congress to regulate counterfeiting activities. As the Supreme Court has stated:

> The Constitution expressly empowers congress to "provide for the Punishment of counterfeiting the Securities and current Coin of the

United States. U.S. Const., Art. I, § 8, cl. 6. Pursuant to that authority, Congress enacted [several] statutes that together restrict ... reproductions of currency."

Defendants[3] have filed a motion to dismiss, and the parties have filed cross-motions for summary judgment. For the reasons stated below, defendants' motion for summary judgment is granted.[4]

## I. Introduction

J.S.G. Boggs is an artist and academic.[5] His work has been exhibited throughout America and Europe and is currently on exhibit under the auspices of the Smithsonian Institution. Mr. Boggs' work has been the subject of wide-spread media attention.[6] This notoriety is due, in part, to the fact that much of Mr. Boggs' work is in the "image of money." *See* Complaint for T.R.O., Prelim. & Perm.Inj., & Other Relief ("Complaint")

¶ 4; Aff. Boggs ¶ 6. Many are actual-sized, *trompe l'oeil* pieces.[7] *Id.* ¶ 6; Boggs Aff. ¶ 3. After explaining to merchants that he is an artist, Mr. Boggs then barters these pieces, offering to exchange his art for the face value of the reproduction in goods and services.[8] Boggs has "spent" thousands of pictures of currency ("Boggs Bills") around the world over the last eight years. *Id.*[9]

The purpose behind Boggs' approach to art does not appear to be to defraud those with whom he barters.[10] As he states:

> I have brought art out of the museum and into the street. I explore issues of trust, value, aesthetic beauty and questions about the usefulness and value of art—all in a dialogue *with* the viewer, rather than in a

*Regan v. Time, Inc.*, 468 U.S. 641, 643, 104 S.Ct. 3262, 3264, 82 L.Ed.2d 487 (1984) (citation omitted).

3. Defendants are various United States government officials who are statutorily charged with the administration and enforcement of the counterfeiting laws of the United States. Lloyd M. Bentsen is Secretary of the United States Department of the Treasury, responsible for the enforcement of the laws of the United States which define, and provide for the punishment of, counterfeiting and forgery of United States currency. Eljay Bowron is Director of the United States Secret Service, a division of the Department of the Treasury, and is responsible for the detection and arrest of persons who violate federal counterfeiting laws. Janet Reno is the Attorney General of the United States, responsible for the administration of the United States Department of Justice, including its activities with respect to the nation's penal laws.

4. This court has already denied plaintiff's Motion for Temporary Restraining Order after a hearing on September 3, 1993 by Order dated September 7, 1993.

5. Mr. Boggs is presently a Fellow of Art and Ethics at Carnegie Mellon University. Plf.'s Mem.Mot.T.R.O. & Prelim.Inj. at 2.

6. Indeed, Mr. Boggs' work has been featured in numerous prestigious newspapers and artistic journals, television news features, and even a documentary film entitled *The Money Man.*

7. "Trompe l'oeil" means "fool the eye."

8. Collectors of Mr. Boggs' work do not simply buy a Boggs Bill. They contact the artist, not to buy the work from him, but rather to get information about where they can go to purchase "the transaction." Mr. Boggs supplies the item for which he bartered, the receipt for the items bar-

tered, the change from the exchange, and the name and address of the person in possession of the Boggs Bill. The collector purchases the Boggs Bill from a holder, usually for far more than the face value of the Boggs Bill or the value given by the holder in exchange for the bill. Then the collector again contacts Mr. Boggs for help in displaying the complete transaction in a framed display.

For example, in *The Money Man,* Boggs convinced a hotel to accept his Boggs Bills in exchange for his account during his stay at the hotel. The hotel than had Boggs create an artistic display for their lobby, featuring the transaction. Boggs framed the papers evidencing his hotel debt, the change he received from the hotel (the face value of the Boggs Bill—the hotel fee), and something representative of his visit to the hotel, the bath robe he used during his stay.

9. Mr. Boggs inadvertently began creating illustrations of money. While attending a 1984 Art Expo, Boggs "found himself in a diner having a doughnut and coffee while doodling on a napkin." Plf.'s Mem.Mot.T.R.O. & Prelim.Inj. at 8. While embellishing the numeral one on a napkin, a waitress asked to buy "the most beautiful dollar" she had ever seen. *Id.* Boggs declined, but allowed the waitress to accept it as payment for the 90 cent meal. In exchange, the waitress insisted on giving a dime in change. *Id.* Boggs framed this dime and embarked on his current approach to art.

10. Boggs asserts that he is "careful not to make his work look so 'real,' however, that an ordinary person of average intelligence cannot immediately and readily distinguish between Boggs Bills and genuine currency." Plf.Mot.Summ.J. ¶ 4. Boggs vehemently denies the label counterfeiter but concedes that in the past individuals have counterfeited his reproductions, Ex. 3, Defs.' Mot.Dismiss.

monologue directed *at* the viewer. In proposing a transaction, I generally ask a series of questions designed to prompt the viewer into thinking about the meaning and uses of art and money in everyday life. My art allows me to ask the viewer, directly, what art should look like, what should be done with it, and what it represents. In part, my work is designed to elucidate the idea that the value of money ... should be consciously accepted on the basis of our trust in each other and in our social and political institutions. My work allows art ... to reach people who cannot be coaxed into galleries and museums.

Boggs' Aff. ¶ 7–8.

An unlikely collector, the Secret Service has taken a keen interest in the work of Mr. Boggs. In September 1990, Secret Service agents effectively stopped the publication of a catalog featuring Mr. Boggs' work. When Secret Service agents seized the color proofs for the catalog, they informed the printing company that the publication of Boggs' work, in their actual dimensions and in full color, would be in violation of the counterfeiting statutes. Compl. ¶ 9. The United States Attorney in Florida did not bring charges. *Id.* ¶ 10.

In March 1991, reports of Mr. Boggs' attempting to obtain merchandise from a local store using a reproduction of United States currency prompted a visit from the Secret Service in Cheyenne, Wyoming. *Id.* ¶ 11. A Secret Service special Agent and the United States Attorney for the District of Wyoming visited Boggs in his hotel room. At their request, Boggs provided a general sample of 15 Boggs Bills.[11] Boggs was advised that his reproductions appeared to be in violation of the counterfeiting statutes and were subject to seizure. This sample is being retained by the Secret Service as contraband. Defs.' Mot. Dismiss at 4. On October 4, 1991, the Office of the United States Attorney for the District of Wyoming declined prosecution of Boggs. Compl. ¶ 12.

In September 1992, the Pittsburgh area Secret Service was alerted to Boggs' attempts to use his reproductions in the Pittsburgh area. *Id.,* Abraham Aff. ¶ 2. Boggs contacted the Pittsburgh Field Office by telephone and voluntarily appeared for an interview on October 1, 1992. During the interview, Boggs would not produce any other samples. The Secret Service provided Mr. Boggs with a pamphlet explaining the guidelines for reproducing currency; however, Mr. Boggs stated that he was familiar with the guidelines, but did not believe they applied to his work. *Id.* ¶ 5.

In November 1992, a press clipping alerted the Secret Service to the fact that Boggs had printed one million dollars in Boggs Bills and was planning to use the notes in the Pittsburgh area during the next year. *Id.* ¶ 7–8. On December 1, 1992, after consultation with the United States Attorney's Office for the Western District of Pennsylvania, the Secret Service obtained federal search warrants for the residence, studio, and office of Boggs. The Service seized several items, characterized by Boggs as the bulk of his life's work, pursuant to the properly executed warrants. Plf.'s Mem.Mot.T.R.O. & Prelim.Inj. at 2, 11. In a December 8, 1992, meeting with agents of the Secret Service, Boggs was advised that his reproductions were in violation of the statute and that he could be prosecuted for his actions if he continued. Compl., Abraham Aff. ¶ 10.

On February 8, 1993, the United States Attorney for the Western District of Pennsylvania sent a cease and desist letter to Boggs, stating that continued reproducing and passing of Boggs Bills could subject him to prosecution. The letter expressed that the Service viewed his "continued manufacture, possession and distribution of 'Boggs bills' as a violation of the law." The United States Attorney's Office is currently considering whether it will prosecute Mr. Boggs in Pennsylvania.[12]

---

11. "Despite repeated requests, the Secret Service has not returned the art to Boggs." *Id.* ¶ 12. They were retained by the Secret Service as contraband. Henson Decl. at ¶ 9.

12. This court, however, requested and received assurances from the United States Attorney's Office for the Western District of Pennsylvania that they would not prosecute Mr. Boggs pending decision on the pending motions in this case.

On May 25, 1993, Boggs attempted to resolve the matter through administrative means. He petitioned the Secretary of the Treasury pursuant to 18 U.S.C. § 504 for permission to continue his reproduction and distribution of Boggs Bills. Compl., Ex. A.[13] Prosecutors agreed to refrain from taking steps to indict Boggs pending the decision by the Secretary. Plf.'s Mem.Mot.T.R.O. & Prelim.Inj. at 3. On September 2, 1993, Boggs' petition was denied by the Secret Service. *Id.*, Ex. B. On September 3, 1993, Boggs initiated the current proceeding.[14]

## II. Motion to Dismiss for Failure to State a Claim

### A. Standard of Review

■ Before reaching the merits of plaintiff's claims, however, the court must address its jurisdiction over this matter. Defendants suggest that the complaint should be dismissed for failure to state a claim for equitable relief. When reviewing the adequacy of a complaint for purposes of a Rule 12(b)(6) motion, plaintiff's factual allegations must be presumed true and liberally construed in favor of the plaintiff. *Phillips v. Bureau of Prisons*, 591 F.2d 966, 968 (D.C.Cir.1979) (citing *Miree v. DeKalb County, Georgia*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977)). In addition, the plaintiff must be given every favorable inference that may be drawn from his allegations of fact. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). "However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." 2A *Moore's Federal Practice*, § 12.07, at 63 (2d ed. 1986) (footnote omitted); *see Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C.Cir.1987) (citing *Pauling v. McElroy*, 278 F.2d 252, 254 (D.C.Cir.), *cert. denied*, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960)).

■ Dismissal is only appropriate if it appears beyond doubt that no set of facts proffered in support of plaintiff's claim would entitle him to relief. *Haynesworth*, 820 F.2d at 1254 (citations omitted); *Phillips*, 591 F.2d at 968.

### B. Reaching the Merits of this Case

■ Plaintiff asks this court to enjoin the ongoing criminal investigation and possible future criminal prosecution in the Western District of Pennsylvania on constitutional grounds. Compl. at 10. The question is whether this court should reach the merits of this case. Defendants suggest not. After considering the extraordinarily well-written pleadings and memoranda of all parties, this court believes that it may hear the merits of this request for injunctive relief under the Declaratory Judgment Act, the equities of the situation at hand requiring this court to provide a forum for plaintiff's complaint.[15]

The Declaratory Judgment Act states:

(a) *In a case of actual controversy within its jurisdiction,* except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of Canadian merchandise, as determined by the administering authority, *any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration,*

---

**13.** Under 18 U.S.C. § 504, the Treasury Department may authorize reproductions of currency. The section states:

(2) The provisions of this section shall not permit the reproduction of illustrations of obligations or other securities, by or through electronic methods used for the acquisition, recording, retrieval, transmission, or reproduction of any obligation or other security, *unless such use is authorized by the Secretary of the Treasury.* The Secretary shall establish a system to ensure that the legitimate use of such electronic methods and retention of such reproductions by businesses, hobbyists, press or others shall not be unduly restricted.
18 U.S.C. § 504(2).

**14.** Mr. Boggs has been the subject of numerous lawsuits in other countries. In England and Australia, Mr. Boggs was unsuccessfully prosecuted. In London, Mr. Boggs was acquitted by a jury; in Sydney, the judge threw out the case before trial. Ex. A.

**15.** This court has original jurisdiction pursuant to 28 U.S.C.A. § 1331 (1993).

the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. 28 U.S.C.A. § 2201 (West Supp.1993) (emphasis added).

Under the Declaratory Judgment Act, the court must have before it "a case of actual controversy within its jurisdiction." This phrase has often been interpreted as synonymous with the "case or controversy" requirement of Article III of the Constitution. "[C]oncrete legal issues, presented in actual cases, not abstractions" are required for adjudication of legal disputes. *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 423, 61 S.Ct. 291, 306, 85 L.Ed. 243 (1940); *see also Golden v. Zwickler*, 394 U.S. 103, 110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969); *Electric Bond & Share Co. v. SEC*, 303 U.S. 419, 443, 58 S.Ct. 678, 687, 82 L.Ed. 936 (1938).[16] "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

In order for a party to seek preenforcement review of a statute, the dispute must also be ripe for adjudication. 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 2757 (1983). For example, a plaintiff can usually challenge the legality of a statute only when he or she is prosecuted for its violation. Then, the plaintiff can raise a defense that the law is unconstitutional.

However, a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims

deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). *Threats* of criminal prosecution may provide a basis for adjudication. *Id.* A plaintiff "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973). Indeed, civil actions for declaratory relief against criminal prosecution have become a common method of challenging the constitutionality of federal statutes. Moreover, courts have not hesitated to restrain or enjoin criminal prosecutions where First Amendment rights are at stake. *PHE, Inc. v. Department of Justice*, 743 F.Supp. 15, 26 (D.D.C.1990).

As Wright, Miller, and Kane explain:

[C]ourts have declined to hear cases seeking a declaratory judgment on the constitutionality of a particular statute ... when plaintiff has not shown that there is any immediate threat that the statute will be enforced against him. But, courts also have not hesitated to issue a declaration if "one or both parties have taken steps or pursued a course of action which will result in " 'imminent' and 'inevitable' litigation...." Thus, when the threat of prosecution under a challenged statute is real, a declaratory judgment on the constitutionality of the statute is appropriate.

10A Wright, Miller, & Kane, *supra*, § 2757 (footnotes and citations omitted). Inherent in this rule of law is that there is an unfairness to requiring a person to violate a law in order to challenge it.

In considering whether to entertain a case, a court should consider the hardship to the parties in withholding court consideration and the significance of the harm in denying review. These factors must be weighed on a case-by-case basis,[17] construing the Declara-

---

16. Although 28 U.S.C. § 2201 authorizes the court to declare the rights of the parties before it, the statute permits no relief which is not "consonant with the exercise of the judicial function in the determination of controversies to which under the Constitution the judicial power extends." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937).

17. It is "well settled by a multitude of cases that the granting of a declaratory judgment rests in the sound discretion of the trial court exercise in the public interest." 10A Wright, Miller, & Kane, *supra*, § 2759.

tory Judgment Act liberally so as to effectuate its broad, remedial purpose.

■ Because the separation of powers doctrine dictates substantial deference with respect to prosecutorial decisionmaking in investigations and prosecutions, there is a strong policy against intervening in ongoing criminal investigations. *North v. Walsh,* 656 F.Supp. 414, 420 (D.D.C.1987). The standard of obtaining any form of injunctive relief is high, but a party who seeks to enjoin a criminal investigation has a particularly heavy burden. *Id.* Our Court of Appeals has denied such equitable relief, ruling that "only the most extraordinary circumstances warrant anticipatory judicial involvement in criminal investigations." *Id.* (citing *Reporters Committee for Freedom of the Press v. AT & T,* 593 F.2d 1030, 1065 (D.C.Cir.1978), *cert. denied* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979)). In addition, the Supreme Court has routinely rejected collateral challenges which impede ongoing criminal investigations.

The rationale is threefold. First, courts must protect the public's interest in the fair and expeditious enforcement of the criminal laws. Second, courts should balance the defendant's need to assert his rights against the judiciary's interest in conserving its resources. And third, principles of separation of powers caution courts against intervening in a criminal investigation conducted by another branch of government. *Id.*

Despite the caution which a court must exercise in deciding whether to hear the merits of a declaratory action to enjoin a criminal prosecution, Mr. Boggs is involved in a controversy ripe for adjudication. Having exhausted his administrative remedy, Mr. Boggs has pursued a course of conduct that will result in inevitable litigation.[18] There is no question that Mr. Boggs and the Secret Service have "adverse legal interests." This court believes these interests are of "sufficient immediacy and reality" to warrant adjudication.

Mr. Boggs is also justified in his well-founded fear of prosecution. Boggs has received numerous warnings emanating from the Treasury Department. *See supra* Part I. Plaintiff has been told that if he does not cease and desist "from the use of any future reproductions of currency appearing in color," the matter will be turned over to the United States Attorney for "appropriate action." The United States Attorney has never disavowed the possibility of prosecution. *See supra* footnote 10.

"The absence to date of prosecutorial action with respect to plaintiff does not diminish or lessen the immediacy and ripeness of this controversy: '[c]ontingency of official enforcement of clearly applicable criminal prohibitions should not be grounds for denying present review, even if there is no demonstrated threat of prosecution.' " *Time, Inc. v. Regan,* 539 F.Supp. 1371, 1382 (S.D.N.Y. 1982), *aff'd in part and rev'd in part* 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (citations omitted).

In addition, Mr. Boggs is being injured by the Secret Service in a number of ways other than threat of prosecution. Not only has the Secret Service seized his work, but also Mr. Boggs finds himself unable to sell his art. Fear of Secret Service seizure has also caused the artists' cooperative where Boggs lives to stop accepting his work. Boggs Aff. ¶ 15. Collectors and gallery owners who would like to show or buy Boggs' work are also fearful of Secret Service intervention. *See* Sam Berkowitz Aff.

In *Wagner v. Simon,* 412 F.Supp. 426 (W.D.Mo.1974), *aff'd* 534 F.2d 833 (8th Cir. 1976), the court reached the merits of a declaratory relief claim in a case with facts

---

**18.** Defendants provide adequate evidence of Mr. Boggs' situation. The Declaration of Special Agent Thomas M. Abraham states:

On December 8, 1992, I interviewed Mr. Boggs at his request in the presence of two Assistant United States Attorney's [sic] in Pittsburgh. Mr. Boggs indicated that he was was [sic] an artist and not a counterfeiter, and that he would continue to make and pass "Boggs Bills." Boggs was advised that his reproductions were in violation of the statute and that *he could be prosecuted for his actions if he continued. Mr. Boggs stated that he understood these violations, but they do not relate to him or his work. He continued that he will draw and pass these bills even if he would be sent to prison.*

Decl. Abraham ¶ 10 (emphasis added).

strikingly similar to the present case. Plaintiff requested that the court declare that a "work of art" that he created by using a photographic enlargement of a fifty dollar Federal Reserve note, which was seized by agents of the United States Secret Service under the provisions of section 474, was not within the scope of the counterfeiting statutes, and to declare that section 474 of that statute was unconstitutional or unconstitutional as applied to plaintiff. *Id.* 412 F.Supp. at 428.

Plaintiff created a black and white enlargement from a negative of the federal reserve note, and modified the bill, creating images within the currency reproduction that expressed criticism of President Nixon's economic policies and his involvement in the Watergate scandal. *Id.* The court held that the "seizure of the facsimile by the Secret Service and the threats of criminal prosecution have effectively prevented plaintiff from marketing and displaying reproductions of the facsimile." The court noted that these facts were sufficient to satisfy the case or controversy requirement of Article III. *Id.* at 430.

Defendants also assert that Rule 41(e) of the Federal Rules of Criminal Procedure provides an adequate remedy at law for the violation of Boggs' First Amendment rights. Rule 41(e) involves the return of *property* held by or on behalf of the Court. While the return of plaintiff's property is important, it is not a substitute for declaratory and injunctive relief vindicating his constitutional rights. Moreover, Rule 57 provides that "another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." Fed.R.Civ.P. 57. The language in the Declaratory Judgment Act itself establishes beyond doubt that declaratory relief is alternative and not exclusive.[19]

## III. Motions for Summary Judgment on Injunctive Relief

The court will now address the parties' cross-motions for summary judgment. Since both motions raise the same issues, the court will consider the two motions simultaneously.

In his quest for declaratory and injunctive relief, plaintiff contends that 18 U.S.C. §§ 474 and 504 prohibit plaintiff from using illustrations or likenesses of United States currency as vehicles for the expression of opinions and ideas in violation of his First Amendment rights. Plaintiff contends that these provisions are overly broad and curtail plaintiff's right of free speech, constituting unconstitutional censorship of his work. Plaintiff suggests that these statutes are unconstitutional on their face, and as applied to the activities of plaintiff. Plaintiff argues against the existence of any compelling governmental interest justifying the need for the constraints placed upon his symbolic use of illustrations of money. Plaintiff also states that the challenged provisions are not narrowly tailored so as to advance any constitutionally cognizable compelling governmental interest that may exist without unnecessary abridgement of First Amendment rights.[20] Finally, plaintiff suggests that the statutory provisions do not apply to his work.

Plaintiff requests the court to (1) enjoin defendants from (a) prosecuting plaintiff or

---

19. The rule states that a party may seek a declaration of its rights "whether or not further relief is or could be sought."

20. In his original complaint, Boggs suggested that his work that was seized and destroyed by the Secret Service. He requested the return of his property, claiming that defendants violated his rights under the Due Process Clause of the Fifth Amendment. Compl. ¶¶ 26–32. However, defendants denied that any of Mr. Boggs' work had been destroyed, noting that the Boggs Bills were being held as contraband. Indeed, defendants contend that they asked plaintiff on several occasions to list property he believed to be lost or destroyed. Abraham Aff., ¶ 12. It appears that plaintiff abandoned this argument following as-

surances from the government that his art had not been destroyed.

As noted in the memorandum supporting defendants' motion for summary judgment, it appears that plaintiff has abandoned his Fifth Amendment claim:

This became clear when plaintiff failed to dispute defendants' assertion that it had been abandoned in plaintiff's opposition to defendants' motion to dismiss. It is further supported by the fact that plaintiff's motion for summary judgment exclusively addresses the first claim in plaintiff's Complaint, his First Amendment claim.

Defs.' Mem.Mot.Dismiss at 1 n. 1.

taking action to prosecute him under 18 U.S.C. §§ 471–509, (b) taking action to interfere with plaintiff's artistic work, and (c) damaging or destroying his possessions; (2) direct defendants to return all property that was seized by the Secret Service; and (3) award compensatory damages to plaintiff for interference with and injury to his property. Compl. at ¶¶ 10–11.

The defendants contend that sections 474 and 504 constitute reasonable time, place, and manner restrictions upon free speech. Defendants suggest that the goals of these provisions are to prevent counterfeiting and to preserve and maintain the integrity of the currency system of the United States. Defendants argue that they are constitutional facially and as applied to plaintiff. The government suggests that they have tailored minimal restrictions aimed at the manner or style in which money is illustrated rather that to the content of illustrations of United States currency. They maintain that the First Amendment does not guarantee to plaintiff the right to illustrate money as a symbol in precisely the manner plaintiff happens to consider most effective. Defendants also challenge the existence of any case or controversy between plaintiff and defendants.

## A.   Standard of Review

A district court may grant summary judgment if it is clear that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate only if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Washington Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C.Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). Rule 56(c) dictates that "the mere existence of some alleged factual dispute between the parties shall not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (emphasis in original). For purposes of evaluating a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party. *Id.* (citations omitted).

## B.   The Merits of the Summary Judgment Motions

### 1.   Constitutional Challenges to the Statutes

This court now faces a task similar to the one the Supreme Court faced in the case of *Regan v. Time, Inc.*, 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984). In that case, Time, Inc., the publisher of several popular magazines, challenged the validity of sections 474 and 504. Over the course of many years, Time, Inc. was advised by Secret Service agents that particular photographic reproductions of currency appearing in its magazines violated these provisions. Nevertheless, Time continued to use the reproductions. *Id.* at 646, 104 S.Ct. at 3265. The cover of the February 16, 1981, issue of Sports Illustrated featured a color photographic reproduction of $100 bills pouring into a basketball hoop. The Secret Service informed Time that the illustration violated federal law. The Service demanded seizure of all plates and materials used in connection with the production of the cover. The Service also requested the names and addresses of all involved in the preparation of the cover. Time initiated a suit remarkably similar to the present action, seeking a declaratory judgment that sections 474 and 504 were unconstitutional on their face and as applied to Time, as well as an injunction preventing the defendants from enforcing or threatening to enforce the statutes. *Id.*

In the plurality opinion of the Court, authored by Justice White, the Court determined that the "purpose" clause of section 504 was unconstitutional, failing as a valid time, place, and manner regulation because it discriminated on the basis of content. *Id.* at 648, 104 S.Ct. at 3266. Nevertheless, the Court found neither section 474 nor the entirety of section 504 to be unconstitutional on its face or as applied to Time, Inc. *Id.* at 659, 104 S.Ct. at 3272.

However, that decision is not dispositive on all of the issues raised in the present case.

Moreover, since the decision in *Regan*, section 504 has been rewritten by Congress in an attempt to remedy the unconstitutional portions of the statute struck down by the Supreme Court's pronouncement. Today, this court reviews the current statutory provisions to determine whether they can survive constitutional scrutiny on their face or as applied to Boggs.

■ As a threshold matter, a court should determine whether the speech at issue is covered by the First Amendment. *Time, Inc. v. Regan*, 539 F.Supp. at 1382–83. In so doing, the court "must look to the content of the expression." *Id.* at 1383 (citations omitted). "The image of money is a powerful, expressive symbol, of significant value" in the communication of ideas. *Id.* "It is, to state the obvious, a particularly effective symbol for the communication of ideas about money itself." *Id.* It is clear that plaintiff uses his illustrations of money to illustrate and question "the meaning and uses of art and money in everyday life." Boggs' Aff. ¶ 7. Boggs' use of illustrations of money are "intimately related to the expression and communication of [his] ideas." *Time, Inc. v. Regan*, 539 F.Supp. at 1383. The publication or printing of illustrations of United States currency is protected speech under the First Amendment of the Constitution. Therefore, Mr. Boggs has a First Amendment right to create illustrations of United States currency

absent constitutionally permissible overriding considerations.[21]

■ Plaintiff challenges the constitutionality of the statutes at issue in this case. Plaintiff bears a heavy burden in seeking to have sections 474 and 504 declared unconstitutional on their face. As the Supreme Court stated in *United States v. Salerno*,

> A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be valid. The fact that the … Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid.

481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Moreover, a statute carries a presumption of constitutionality. *North v. Walsh*, 656 F.Supp. 414, 420 (D.D.C. 1987).

"Because of the interrelationship of sections 474 and 504, the ultimate constitutional analysis must be directed to the impact of these sections in tandem." *Time, Inc. v. Regan*, 539 F.Supp. at 1385. Criminal liability is only imposed under section 474 when a likeness of United States currency fails to meet the requirements imposed by section 504.[22] The exceptions in section 504 apply

**21.** It is well settled that "freedom of expression" does not cover all modes of communication of ideas by conduct. *United States v. O'Brien*, 391 U.S. 367, 375, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). Where speech and nonverbal elements combine to form conduct, "incidental limitations on First Amendment freedoms may be justified where there is a sufficiently important governmental interest in regulating the non-speech elements of that course of conduct." *Id.* at 376, 88 S.Ct. at 1678. The First Amendment values must be balanced against competing societal interests.

Mr. Boggs' work can be viewed in one of two ways. First, the transaction itself can be viewed as the conduct. As Boggs states about his first transaction that inspired him to create Boggs Bills:

> [This transaction] and others like it have become, for me, a means of achieving my goals as an artist. I have brought art out of the museum and into the street…. All in a dialogue with the viewer, rather than in a monologue directed at the viewer….

Boggs Aff. ¶ 7. Thus, his work encompasses the act of bartering itself. Second, Boggs' work can be viewed as simply the Boggs Bill itself. This can also be viewed as the use of "symbolic" or "expressive" speech, and not pure speech.

Regardless of how one views Mr. Boggs' work, and the exact tag given its mode of speech, the statutory scheme must equate to a reasonable manner restriction as discussed *infra*. All the elements of the *O'Brien* test are subsumed under the test as a reasonable manner restriction.

**22.** The relevant text of § 504 states:

> Printing and filming of United States and foreign obligations and securities

Notwithstanding any other provision of this chapter, the following are permitted:

(1) the printing, publishing, or importation, or the making or importation of the necessary plates for such printing or publishing, of illustrations of—

(A) postage stamps of the United States,

(B) revenue stamps of the United States,

(C) any other obligation or other security of the United States, and

"notwithstanding any other provision of this chapter," including section 474. "Thus, if the restrictions imposed by § 504 sufficiently accommodate ... First Amendment interests, both statutes must be upheld." *Regan v. Time, Inc.*, 468 U.S. 641, 647, 104 S.Ct. 3262, 3266, 82 L.Ed.2d 487 (1984). This court therefore begins with an analysis of the restrictions imposed by section 504.

In *Regan*, the government attempted to justify the restrictions imposed by section 504 as a reasonable time, place, and manner regulation.[23] Under that statutory scheme, a person could create illustrations of currency if the reproductions met the purpose, publication, color, and size requirements set out in section 504(1). Under the "purpose" clause, one could create an illustration of currency if made for "philatelic, numismatic, educational, historical, or newsworthy purposes." According to the "publication" clause, these illustrations were appropriate for publication in "articles, books, journals, newspapers, or albums." In addition, any permitted illustrations had to meet various size and color restrictions.

> Notwithstanding any other provision of this chapter, the following are permitted:
>
> (1) the printing, publishing, or importation, or the making or importation of the necessary plates for such printing or publishing, of illustrations of—
>
> (A) postage stamps of the United States,
>
> (B) revenue stamps of the United States,
>
> (C) any other obligation or other security of the United States, and
>
> (D) postage stamps, revenue stamps, notes, bonds, and any other obligation or other security of any foreign government, bank, or corporation *for philatelic, numismatic, educational, historical, or newsworthy purposes in articles, books, journals, newspapers, or albums (but not for advertising purposes, except illustrations of stamps and paper money in philatelic or numismatic advertising of legitimate numismatists and dealers in stamps or publishers of or dealers in philatelic or numismatic articles, books, journals, newspapers, or albums.)*
>
> Illustrations permitted by the foregoing provisions of this section shall be made in accordance with the following conditions:
>
> (i) all illustrations shall be in black and white, except that illustrations of postage stamps issued by the United States or by any foreign government may be in color;
>
> (ii) all illustrations (including illustrations of uncanceled postage stamps in color) shall be of a size less than three-fourths or more than one and one-half, in linear dimension, of each part of any matter so illustrated which is covered by subparagraph (A), (B), (C), or (D) of this paragraph, except that black and white illustrations of postage and revenue stamps issued by the United States or by any foreign government and colored illustrations of canceled postage stamps issued by the United States may be in the exact linear dimension in which the stamps were issued; and
>
> (iii) the negatives and plates used in making the illustrations shall be destroyed after their final use in accordance with this section.
>
> 18 U.S.C. § 504 (1984). The underlined portion of paragraph 504(1)(D) was the "purpose" clause. The italicized portion of paragraph 504(1)(D) constitutes the "publication" clause.

> (D) postage stamps, revenue stamps, notes, bond, and any other obligation or other security of any foreign government, bank, or corporation. Illustrations permitted by the foregoing provisions of this section shall be made in accordance with the following conditions—
>
> (i) all illustrations shall be in black and white, except that illustrations of postage stamps issued by the United States or by any foreign government and stamps issued under the Migratory Bird Hunting Stamp Act of 1934 may be in color;
>
> (ii) all illustrations (including illustrations of uncanceled postage stamps in color and illustration so f stamps issued under the Migratory Bird Hunting Stamp Act of 1934 in color) shall be of a size less than three-fourths or more than one and one-half, in linear dimensions, of each part of any matter so illustrated which is covered by subparagraph (A), (B), (C), or (D) of this paragraph, except that black and white illustrations of postage and revenue stamps issued by the United States or by any foreign government and colored illustrations of canceled postage stamps issued by the United States may be in the exact linear dimension in which the stamps were issued; and
>
> (iii) the negatives and plates used in making the illustrations shall be destroyed after their final use in accordance with this section.
>
> The Secretary of the Treasury shall prescribe regulations to permit color illustrations of such currency of the United States as the Secretary determines may be appropriate for such purposes.
>
> (2) The provisions of this section shall not permit the reproduction of illustrations of obligations or other securities, by or through electronic methods used for the acquisition, recording, retrieval, transmission, or reproduction of any obligation or other security, unless such use is authorized by the Secretary of the Treasury. The Secretary shall establish a system to ensure that the legitimate use of such electronic methods and *retention of such reproductions by businesses*, hobbyists, press or others shall not be unduly restricted.
>
> 18 U.S.C.A. § 504 (West Supp.1993).

**23.** In full, pre–1984 § 504(1) provided:

Plaintiffs argued that the purpose requirement of section 504 was not a valid time, place, and manner regulation because it discriminated on the basis of content, and the Supreme Court agreed. The Court held that "[a] determination concerning the newsworthiness or educational value of a [reproduction] cannot help but be based on the content . . . and the message it delivers." The Court went on to say that the legality of the reproduction was often "dependent solely on the nature of the message being conveyed." *Regan*, 468 U.S. at 648, 104 S.Ct. at 3266 (quoting *Carey v. Brown*, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980)). The Court reiterated its position with regard to regulations affecting First Amendment rights:

> Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.

*Id.* 468 U.S. at 648–49, 104 S.Ct. at 3266–67 (citations omitted).[24]

In response to this decision, Congress revised 18 U.S.C. § 504, deleting the purpose and publication clauses.[25] The current section 504 only sets out "size and color" limitations on illustrations of currency.[26] Under this section, persons may be authorized by the Secret Service to make illustrations of United States currency if the illustrations are in black and white and of a size that is less than three-fourths or more than one and one-half times the linear dimension of real currency.[27]

■ In the present action, defendants again attempt to justify the restrictions imposed by section 504 as reasonable time, place, and manner regulations. In order to be constitutional, a time, place, and manner regulation must meet three requirements. First, it "may not be based upon either the content or subject matter of speech." *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981) (quoting *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980)). Second, it must "serve a significant governmental interest." *Id.* 452 U.S. at 649, 101 S.Ct. at 2564 (quoting *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)). And third, it must "leave open ample alternative channels for communica-

---

24. The plurality opinion of the Court did not address the plaintiffs' challenge of validity to the publications clause on vagueness and other grounds. The Court simply stated that Time had and would never "have any difficulty in meeting that requirement." *Id.* at 649, 104 S.Ct. at 3267. Two Justices felt that the publications clause was facially overbroad. *Regan*, 468 U.S. at 677–90, 104 S.Ct. at 3281–89 (Brennan, J., concurring and dissenting). Two others felt that the statute could not stand without the publications clause, and therefore the entire statute should be invalidated without considering whether the clause could survive independently. *Id.* at 691–92, 104 S.Ct. at 3289 (Powell, J., concurring and dissenting). One other felt it "wholly unnecessary to consider" the issue. *Id.* at 696, 104 S.Ct. at 3291 (Stevens, J., concurring and dissenting).

25. Plaintiff still argues that the publication clause is unconstitutional. Defendants argue that the "publication" regulation has been deleted from the statute, and this court agrees.

Plaintiff argues that the publication clause permits "only the 'printing, publishing, or importation' of illustrations meeting the size and color restrictions." Plf.'s Opp'n Def.'s Mot.Dismiss at 2–3; 18 U.S.C. § 504(1). However, in *Regan*, the Supreme Court identified the publication clause as the provision requiring that the illustrations be published "in articles, books, journals, newspapers or albums (but not for advertising purposes, except illustrations of stamps and paper money in philatelic or numismatic advertising of legitimate numismatists and dealers in stamps or publishers of or dealers in philatelic or numismatic articles, books, journals, newspapers, or albums)." Thus, plaintiff's argument that the "publication" clause is unconstitutional is incorrect; indeed, the issue is moot.

26. This section also sets out restrictions regulating reproductions of currency and other obligations created from motion pictures, microfilms, and slides that are not at issue in this case.

27. Congress also added a paragraph requiring the Treasury to "prescribe regulations to permit color illustrations of such currency of the United States as the Secretary determines may be appropriate for such purposes." 18 U.S.C. § 504(1). No such regulations have been promulgated. No proposals have been published for notice and comment in the Federal Register either. This court did take this disturbing Treasury inaction into consideration in determining whether to hear the merits of the case and deciding this matter.

tion of the information." *Id.* 452 U.S. at 648, 101 S.Ct. at 2564 (quoting *Virginia Pharmacy Board,* 425 U.S. at 771, 96 S.Ct. at 1830). In addition, restrictions on First Amendment rights "must ... be narrowly tailored and no more burdensome than necessary to advance the protective goal" of the government. *Action for Children's Television v. FCC,* slip op. at 26, 11 F.3d 170 (D.C.Cir.1993); *see also, e.g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam); *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).[28] This is an overbreadth doctrine: a law is void on its face if it "does not aim specifically at evils within the allowable area of (government) control but ... sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech." *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940).

■ The Supreme Court directly addressed the constitutionality of the size and color restrictions in *Regan v. Time, Inc.*[29] When passing on whether to address the publications clause in *Regan,* the Supreme Court noted in a footnote:

Given the fact we hold that, even in the absence of both the purpose and publication requirements, the color and size requirements can constitutionally be applied

to Time, ... and that Time has made no showing that the validity of the publication requirement by itself is of any interest to it, we see no need to reach out and decide the latter issue on our own.

*Regan,* 468 U.S. at 649–50 n. 6, 104 S.Ct. at 3267 n. 6. The plurality manifest their intent in passing solely on the size and color restrictions by stating:

More importantly, even if both requirements were unconstitutional, it does not follow that the entire statute must fail.... Justice Brennan seems to misconceive the premise upon which our argument is based as he goes to great lengths to establish that the publication requirement and the purpose requirement "are so completely intertwined as to be plainly inseverable.... Our severability argument proceeds on the premise that both the purpose and publication requirements are unconstitutional. Thus, our entire discussion is directed at whether the color and size requirements can survive on their own.

*Regan,* 468 U.S. at 652 n. 9, 104 S.Ct. at 3269 n. 9.[30]

In considering the validity of the color and size limitations, the Court found the size and color restrictions to be reasonable time, place, and manner regulations. The Court noted that the size and color limitations did

28. As the U.S. Court of Appeals noted in *Community for Creative Non–Violence v. Kerrigan,* 865 F.2d 382 (D.C.Cir.1989):

"[T]he 'narrowly tailored' portion of the time, place or manner test requires that there be a *real nexus* between the challenged regulation and the significant governmental interest sought to be served by the regulation. It the regulation does not meaningfully advance the interest, the regulation cannot withstand constitutional scrutiny if it restricts free expression in a public forum."

865 F.2d at 388 (emphasis in original).

29. Although the text of the statute is different, the present size and color restrictions differ in no way from the size and color restrictions at issue in *Regan.*

30. In deciding whether the size and color requirements could survive on their own, the Court stated its cautious approach in reviewing the constitutionality of legislative Acts:

In exercising its power to review the constitutionality of a legislative act, a federal court should act cautiously. A ruling of unconstitutionality frustrates the intent of the elected representatives of the people. Therefore, a court should refrain from invalidating more of the statute than is necessary. As this Court has observed, "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." Thus, this Court has upheld the constitutionality of some provisions of a statute even though other provisions of the same statute were unconstitutional. For the same reasons, we have often refused to resolve the constitutionality of a particular provision of a statute when the constitutionality of a separate, controlling provision has been upheld.

*Regan,* 468 U.S. at 652–53, 104 S.Ct. at 3268–69 (citations omitted).

not discriminate on the basis of content.[31]

**31.** The Court opined:

> Compliance with the color and size requirements does not prevent Time from expressing any view on any subject or from using illustrations of currency in expressing those views. More importantly, the Government does not need to evaluate the nature of the message being imparted in order to enforce the color and size limitations. Those limitations restrict only the manner in which the illustrations can be presented. They are thus similar to the decibel level restrictions upheld by this Court ... and the size and height limitations on outdoor signs upheld by other courts.

*Regan*, 468 U.S. at 656, 104 S.Ct. at 3271 (citations omitted).

Mr. Boggs states:

> The size and color of my work are integral to its meaning. My work simply would not carry the same meaning in black and white or in grotesquely enlarged or comically shrunken size. Their components—size, color, image, texture—are the elements of all visual art. My work is not used to "illustrate" some other point. The image stands alone as the vehicle by which the viewer confronts and understands the ideas my work explores. By altering its components (its size, for example, or its color), I would alter the meaning the work has for the viewer. If the size or color of my work is restricted, its content and meaning are also restricted.

Boggs Aff. ¶ 9. This court notes that Mr. Boggs' work may be somewhat affected when it does not appear to be actual currency. However, this limitation is not *based* on content or the message it delivers. It is a mechanical restriction, requiring no inquiry or evaluation into "the nature of the message being imparted in order to enforce the color and size limitations." *Regan*, 468 U.S. at 656, 104 S.Ct. at 3271. When plaintiff suggests that the size and color restrictions are somehow content-based as they apply to Boggs' work, the Supreme court rejected a similar argument in *Ward v. Rock Against Racism*, when it stated "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not on others." 491 U.S. at 791, 109 S.Ct. at 2754.

As Justice Stevens noted regarding the color limitations, in his concurring and dissenting opinion in *Regan*:

> A color other than the actual color, or one similar to it, might be communicative under some circumstances, ... [and] Time may argue ... that the black and white requirement is overbroad on the ground that it is irrational as applied to any color other than a color similar to the actual color of the currency. But the legitimate sweep of the statute dwarfs its arguably impermissible applications because it seems quite plain that ordinarily it is the actual color which would be selected most often.

**32.** *Id.* at 656, 104 S.Ct. at 3271. Time argued that despite the Government's interest in preventing counterfeiting, the color restrictions were drawn "broader than is necessary to achieve the Government's interest in preventing counterfeiting." *Id.* Time suggested that these restrictions applied regardless of an illustrations' likelihood of deceiving anyone. The Court stated:

> Time places too narrow a construction on the Government's interest and too heavy a burden on those enacting time, place, and manner regulations. The Government's interest in preventing the color photographic reproduction of currency is not limited to its desire to prevent would-be counterfeiters from utilizing the illustration itself. The requirement that the illustration be in black-and-white is also designed to make it harder for counterfeiters to gain access to [items] that could easily be altered and used for counterfeiting purposes.

*Id.* at 656–57, 104 S.Ct. at 3271. The Court concluded its discussion of the color limitations by stating "[i]t is enough that the color restriction substantially serves the Government's legitimate ends."

There is no question that §§ 474 and 504 address substantial governmental interests. *See* U.S. Const., Art. I, § 8, cl. 5 (Congress is empowered "[t]o coin money, regulate the value thereof and of foreign coin, and fix the standard of weights and measures); *id.*, cl. 6 "[t]o provide for the Punishment of counterfeiting the Securities and current coin of the United States"). As observed by Justice Stevens in *Regan*, these governmental functions go to the core of governmental interest. *Regan*, 468 U.S. at 696, 104 S.Ct. at 3291 (Stevens, J., concurring and dissenting).

This court notes that the government has legitimate concerns. In their pleadings, the Secret Service stated that over $55 million in counterfeit currency was seized before being passed to the public and over $16 million was seized in circulation in fiscal year 1992. Decl. Richard Outland ¶ 3. The Secret Service anticipates in the very near future, the public will have wide-

---

*Id.* at 701 n. 5, 104 S.Ct. at 3294 n. 5 (Stevens, J., concurring and dissenting). He continued:

> The front of the United States currency is not very colorful in any event. Aside from the serial numbers and the Seal of the Department of the Treasury, which are a rather vivid green, the rest of the image borders on being black and white itself. The difference between printing a black and white image of it and [sic] color image of it would have a *de minimis* impact on the value of the image for communicative purposes, ... but would have a significant impact on the value of the image for fraudulent or deceptive purposes.

*Id.* at 701 n. 6, 104 S.Ct. at 3294 n. 6.

The Court further stated that "the propriety of the size limitation is even clearer." *Id.* The Court described the size limitation as "a reasonable and sufficiently precise way of ensuring that the illustrations themselves do not have the capacity to deceive the unwary and inattentive." *Regan,* 468 U.S. at 658, 104 S.Ct. at 3272.

In *Regan,* no one disputed that the statute left open adequate alternative channels for communication of information. This element of the test is easily met. The evolution of the counterfeiting statute itself shows how it leaves open ample channels: From prohibiting all illustrations of currency until the enactment of section 504 in 1958, to the current statute restricting only color illustrations that are close in actual size to genuine currency. As the Supreme Court noted in *Regan,* the possibilities are almost limitless. *Regan,* 468 U.S. at 658 n. 13, 104 S.Ct. at 3272 n. 13. Moreover, the issue is whether the statute leaves alternative channels of communication for anyone, not just Boggs. *See Ward v. Rock Against Racism,* 491 U.S. 781, 801, 109 S.Ct. 2746, 2759, 105 L.Ed.2d 661 (1989).

This statute also serves a significant governmental interest. As Justice Stevens noted in *Regan,* "[a] core governmental function is implicated in this case, and the compelling nature of the Government's interest in demonstrated by the fact that ... the Constitution expressly empowers Congress '[t]o provide for the Punishment of counterfeiting the Securities and current Coin of the United States.'" *Regan,* 468 U.S. at 696, 104 S.Ct. at 3291. However, plaintiff challenges that the government does not establish a real nexus between the statute and the governmental interest to be protected. After reviewing the government's evidence as to a real nexus, this court agrees with Justice Stevens that section 504 "is one weapon in an arsenal designed to deprive would-be counterfeiters and defrauders of the tools of deception and, ... I believe the color and size requirements are permissible methods of minimizing the risk of fraud as well as counterfeiting...." *Id.* at 704, 104 S.Ct. at 3296.

In *Regan,* the Supreme Court ruled that the "size and color limitations are ... reasonable manner regulations that can constitutionally be imposed on those wishing to publish photographic reproductions of currency." *Id.* at 659, 104 S.Ct. at 3272. This court finds that section 504 may be constitutionally imposed upon those wishing to create illustrations of currency as well. Section 504 is constitutional, facially and as applied to Mr. Boggs. "Because the provisions of § 474 are of real concern only when the limitations of § 504 are not complied with, § 474 is also constitutional." *Id.*

Justice Brennan, concurring and dissenting, stated:

I do not doubt that a statute can be written that would both satisfy the requirements of the First Amendment and effectively advance the legitimate and important ends Congress sought to achieve in §§ 474, ¶ 6, and 504.

*Id.* at 691, 104 S.Ct. at 3289. This court believes the legislative amendments that devised the current statutory text of sections 474 and 504 have created just such a statute.

2. *Application of Section 474 to Mr. Boggs*

Plaintiff's second challenge to the statutory provisions is that 18 U.S.C. § 474 [33] does not

spread accessibility to advance copier and printing equipment, adding to the current increase in widely dispersed counterfeiting activities. *Id.* ¶ 4. The currency of the United States is the most counterfeited in the world today. *Id.* ¶ 7.

33. § 474 Plates or stones for counterfeiting obligations or securities

(a) Whoever, having control, custody, or possession of any plate, stone, or other thing, or any part thereof, from which has been printed, or which may be prepared by direction of the Secretary of the Treasury for the purpose of printing, any obligation or other security of the United States, uses such plate, stone, or other thing, or any part thereof, or knowingly suffers the same to be used for the purpose of printing any such or similar obligation or other security, or any part thereof, except as may be printed for the use of the United States by order of the proper officer thereof; or

Whoever makes or executes any plate, stone, or other thing in the likeness of any plate designated for the printing of such obligation or other security; or

Whoever sells any such plate, stone, or other thing, or brings into the United States any such plate, stone, or other thing, except under the

apply to him. Section 474 proscribes possession of counterfeit obligations and equipment necessary to a counterfeiting operation. Paragraphs Five and Six of section 474 are at issue in this case.[34]

The necessary elements of proof under paragraphs five and six of section 474 differ. Paragraph five prohibits the possession of any obligation made, in whole or in part, after the similitude of genuine United States currency. This paragraph requires an "intent to sell or otherwise use" the obligation. Under paragraph six, it is a felony to make or execute in any manner an engraving, photograph, print or impression in the likeness of genuine United States currency. No showing of intent is required. *See supra* note 29.

Plaintiff's challenge to the applicability of the statute is threefold. First, plaintiff suggests that an intent to defraud requirement must be read into paragraphs five and six of section 474. No one seriously suggests that

Mr. Boggs has any intent to defraud.[35] In fact, all parties know the nature of the transaction before Boggs engages in any bargaining. Therefore, if intent to defraud is statutorily required, no jury could find that the statute applies to Boggs. Second, plaintiff claims that his illustrations are not after the likeness or in the similitude of genuine United States currency. Finally, plaintiff argues that the plain wording of section 474 does not apply to his creative process or his final product. For these reasons, plaintiff seeks to enjoin the Secret Service from disturbing his work.

### a. Intent to Defraud

Plaintiff argues that every counterfeiting statute requires the government to prove an intent to defraud on the part of the accused. Plaintiff suggests that counterfeiting means to copy or imitate with a eye toward deception or fraud. Plaintiff notes that section 474 was originally a Civil War-era codification [36]

direction of the Secretary of the Treasury or other proper officer, or with any other intent, in either case, than that such plate, stone, or other thing be used for the printing of the obligations or other securities of the United States; or

Whoever has in his control, custody, or possession any plate, stone, or other thing in any manner made after or in the similitude of any plate, stone, or other thing, from which any such obligation or other security has been printed, with intent to use such plate, stone, or other thing, or to suffer the same to be used in forging or counterfeiting any such obligation or other security, or any part thereof; or

*Whoever has in his possession* or custody, except under authority from the Secretary of the Treasury or other proper officer, *any obligation* or other security *made* or executed, *in whole or in part, after the similitude of any obligation* or other security issued under the authority *of the United States, with intent to sell or otherwise use the same;* or

*Whoever prints, photographs, or in any other manner makes* or executes *any engraving, photograph, print, or impression in the likeness of any such obligation* or other security, *or any part thereof,* or sells any such engraving, photograph, print, or impression, except to the United States, or brings into the United States, any such engraving, photograph, print, or impression, except by direction of some proper officer of the United States—*Is guilty of a class C felony.*

(b) For purposes of this section, the terms "plate", "stone", "thing", or "other thing" includes any electronic method used for the acquisition, recording, retrieval, transmission, or reproduction of any obligation or other security,

unless such use is authorized by the Secretary of the Treasury. The Secretary shall establish a system (pursuant to section 504) to ensure that the legitimate use of such electronic methods and retention of such reproductions by businesses, hobbyists, press and others shall not be unduly restricted.

18 U.S.C.A. § 474 (West Supp.1993) (emphasis added).

**34.** The Secret Service objects to focusing on these two specific paragraphs as basis for potential prosecution. The Service suggests that they should not be required to speculate as to which, if any, criminal statutory provisions may form the basis of a criminal prosecution of Mr. Boggs. Although the exact wording of an indictment may be speculative, the Service cannot deny that these sections are applicable to Boggs' work, and the Service does not deny that prosecution may be sought under these two paragraphs. These two paragraphs are attacked by plaintiff, and justified by defendants in their pleadings. Therefore, this court will determine their applicability to Boggs.

**35.** In fact, plaintiff states that he is unaware of a single person who has complained to any law enforcement authority about being defrauded by Boggs or anyone else using his bills. Plf.'s Mem. Mot.T.R.O. & Prelim.Inj. at 3.

**36.** As noted in *Regan,* "Title 18 U.S.C. § 474 was enacted during the Civil War to combat the surge in counterfeiting caused by the great increase in Government obligations to fund the war and the

of a common-law crime, counterfeiting, and that "such codifications are presumed to require proof of the *mens rea* element required for conviction at common law, absent specific congressional intent to the contrary." Plf.'s Mem.Mot.T.R.O. & Prelim.Inj. at 21.

As support for this proposition, plaintiff quotes Chief Justice Burger's exposition in *United States v. United States Gypsum Co.*, 438 U.S. 422, 437–38, 98 S.Ct. 2864, 2873–74, 57 L.Ed.2d 854 (1978):

> "[T]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence. . . . It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.' "

438 U.S. 422, 436, 98 S.Ct. 2864, 2873 (1978) (citing *Dennis v. United States*, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137 (1951); *Morissette v. United States*, 342 U.S. 246, 250–51, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952)). According to *United States Gypsum*, *Morissette* "can be fairly read as establishing, at least with regard to crimes having their origin in the common law, an *interpretative presumption* that *mens rea* is required. . . . Certainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement." *United States Gypsum*, 438 U.S. at 437–38, 98 S.Ct. at 2873–74 (emphasis added).[37]

In *Morissette*, the Air Force established a practice bombing range in a sparsely populated area of Michigan. This area was known to be "good deer country" and was extensively hunted. *Id.* at 247, 72 S.Ct. at 241. The simulated bomb casings were thrown into piles and "were dumped into heaps, some of which had been accumulating for four years or upwards, were exposed to the weather and rusting away." *Id.*

Mr. Morissette unsuccessfully hunted this land. However, being an industrious man, he was struck with an entrepreneurial idea. He began salvaging the bomb casings. He loaded, crushed, and transported these casings, realizing an $84 profit for his efforts.

When investigated, Morissette "voluntarily, promptly and candidly told the whole story to the authorities, saying that he had no intention of stealing but thought the property was abandoned, unwanted and considered of no value to the Government." *Id.* at 248, 72 S.Ct. at 241. Morissette was indicted on the charge that he "did unlawfully, wilfully and knowingly steal and convert" property of the United States of $84 in violation of 18 U.S.C. § 641, which provides for the punishment by fine or imprisonment to "whoever embezzles, steals, purloins, or knowingly converts" government property. *Id.*

Despite his lack of intent to steal, Morissette was convicted by the trial court and sentenced to a fine of $200 or two months in prison. On appeal, the Supreme Court held that the mere omission from section 641 of any mention of intent was not to be construed as eliminating the element from the crime. Thus, a statute codifying the traditional, common-law crime, such as counterfeiting, the argument goes, should carry an interpretive presumption of a *mens rea* requirement, *absent a clear legislative purpose to the contrary*.

### 1. Paragraph Five

The courts dealing with this provision have ruled that no *intent to defraud* requirement exists. Plaintiff argues that these cases fail to address the *Morissette* intent issue and are incorrectly decided. Plaintiff maintains

---

unsettled economic conditions of the time." *Regan*, 468 U.S. at 643, 104 S.Ct. at 3264 (citations omitted). For a more complete history of the counterfeiting statutes, see *id.* at 643–46, 104 S.Ct. at 3264–65.

**37.** Plaintiff also states that *Morissette*'s presumption becomes critical when applied to individual First Amendment rights. As the Ninth Circuit has explained in holding that a "strict liability" criminal statute *must* be interpreted to allow a state-of-mind defense in the prosecution of a filmmaker:

> [T]he First Amendment does not permit the imposition of criminal sanctions on the basis of strict liability where doing so would seriously chill protected speech.

*United States v. United States Dist. Court (Kantor)*, 858 F.2d 534, 540 (9th Cir.1988) (Kozinski, J.). However, this court is of the opinion that the current statutory provisions do not unconstitutionally or seriously chill protected speech.

that even though paragraph five of section 474 explicitly requires an "intent to sell or otherwise use," this section necessarily implies an intent to defraud or pass as genuine.

Although not specifically mentioning *Morissette*, the Eleventh Circuit rejected a similar argument in *United States v. Parr*, 716 F.2d 796, 807–08 (11th Cir.1983). As the court opined:

> We disagree with appellant that the intent standard of § 474 necessarily implies an intent to defraud or an intent to pass as genuine. Congress explicitly stated that an "intent to sell or *otherwise use* " is the requirement. If Congress intended an intent to *defraud* or an intent to *pass as genuine* standard it would have said so explicitly, as in the two sections immediately preceding § 474.

*Id.* 716 F.2d at 808 (citation omitted) (emphasis in original).

■ In *Wagner v. Simon, supra* section II.B., the court stated that "intent in causing the reproduction to be made [in violation of paragraph five] is not a factor to be considered." *Wagner*, 412 F.Supp. 426, 430 (W.D.Mo.1974) (citing *Webb v. United States,* 216 F.2d 151, 152–53 (6th Cir.1954); *Wholesale Vendors, Inc. v. United States*, 361 F.Supp. 1045 (N.D.Tex.), *aff'd,* 486 F.2d 1402 (5th Cir.1973)). This court believes that Congress was clear and agrees with the holdings in *Parr* and *Wagner*. Paragraph five of section 474 does not require an intent to defraud or an intent to pass as genuine.

The evidence is undisputed that Boggs uses his reproductions and illustrations in exchange for substantial economic benefit and artistic recognition. The Service would not be barred from employing paragraph five

in any future criminal prosecution because of the lack of intent on the part of Mr. Boggs.

### 2. Paragraph Six

Paragraph six creates federal penalties for anyone who makes any illustrations of currency for any purpose, even in the absence of an unlawful intent.[38] This provision is enforced regardless of whether such images of money might be fraudulently employed. Again, plaintiff suggests that this section requires an intent to defraud or pass as genuine. This claim is not as easily dismissed because paragraph six of section 474, unlike the other counterfeiting provisions in Title 18, imposes criminal liability without *any* showing of unlawful intent.

At first blush, paragraph six appears to run afoul of the *Morissette* statutory presumption. However, the statutory provision at issue is but one part of a comprehensive scheme to meet the governmental interest in preventing counterfeiting. Other offenses included in the statute, such as the unlawful possession of counterfeit obligations, require proof of unlawful intent according to the express provisions of the statute. However, in this paragraph, Congress provided that the mere making of any print, impression, photograph, or engraving in the likeness of any United States obligation or security is a violation of the statute without proof of unlawful intent. *See Webb*, 216 F.2d at 152.

In *Webb v. United States*, 216 F.2d 151, 152 (6th Cir.1954), appellants "were engaged in a confidence game in which they sought to swindle a third party through an alleged process for making money." Appellants planned to have the party furnish them with $10,000 worth of ten dollar bills. Appellants promised a return of approximately nine times as much money. "In the course of their swindle, they would, of course, abscond

---

**38.** Justice Brennan noticed this fact in *Regan v. Time, Inc.*:

> Title 18 U.S.C. § 474, ¶ 6, makes it a federal crime to use pictures of money for any purpose whatsoever, even in the absence of an unlawful intent, and without regard to whether such pictures, or the materials used to make them, might be employed fraudulently. Recognizing that this flat ban sweeps within it a substantial amount of legitimate expression posing virtually no risk of counterfeiting, Congress enacted 18 U.S.C. § 504....

*Regan v. Time, Inc.*, 468 U.S. 641, 659, 104 S.Ct. 3262, 3272, 82 L.Ed.2d 487 (1984) (Brennan, concurring and dissenting). Justice Brennan's belief that this section contained no *mens rea* element is evidenced by a statement later in the opinion: "And because § 474, ¶ 6, unlike the other counterfeiting provisions in Title 18, imposes criminal liability without any showing of unlawful intent...." *Id.* 468 U.S. at 682, 104 S.Ct. at 3284.

with the genuine money." *Id.* To set up the sting, appellants coated a genuine bill with a common, household disinfectant. Placing it between two sheets of paper, they pressed the sheets against the bill. A considerable amount of ink was transferred. As the demonstration of their process proceeded, Treasury agents arrested them as they completed the transferring process. *Id.*

When appellants attacked the conviction, suggesting that the bills were not in the likeness of currency and were merely samples in furtherance of a scam rather than impressions created with an intent to pass as genuine, the court stated:

> The legislative purpose is clear that Congress intended, in protecting the currency, to tolerate no manipulation in the making of impressions of government obligations or securities, whether the copies or impressions might be good or bad, and regardless of the purpose for which they might be made.... [T]here being no need of proof of unlawful intent, there is no need of proof that such impressions were calculated to deceive.

*Id.*

█ As the Supreme Court has stated, "Congress enacted [several] statutes that together restrict ... reproductions of currency." *Regan,* 468 U.S. at 643, 104 S.Ct. at 3264. This court believes that a logical inference can be drawn from the structure of the counterfeiting statute: Congress intended some crimes to carry an intent to defraud requirement and others not, as evidenced by the differences in classification and punishment set out in the statute.[39] Existing case law dictates that an intent to defraud is not an element of paragraph six. These cases were correctly decided, and given the substantial government interest at stake regarding the currency and the constant threat of counterfeiting, the scope of the statute is reasonable.[40] No facts suggest that a jury would be foreclosed from finding Mr. Boggs guilty of violation of the aforementioned statutory prohibition. The Service should not be prohibited from employing paragraph six in any future criminal prosecution because of the lack of intent on the part of Mr. Boggs.

### b. In the Likeness and After the Similitude

"Boggs' work cannot be said to be in the 'likeness' or 'similitude' or genuine currency." Plf.'s Mem.Mot.T.R.O. & Mot.Prelim.Inj. at 28. So goes plaintiff's argument. Although Boggs describes his work as actual-sized, *trompe l'oeil* pieces, the Complaint states "Boggs' bills do not look so 'real' ... that a person of average intelligence and ordinary observation cannot readily and immediately distinguish them from genuine currency," and that "even the most cursory glance at one of Boggs' bills makes that immediately clear." Compl. ¶ 6.

Paragraph five makes it a felony to possess with intent to sell or use any obligation made, in whole or in part, "after the similitude" of money. Paragraph six forbids illustrations created "in the likeness" of genuine United States currency. The test for these two provisions is different. *See Wagner v.*

---

**39.** The first four paragraphs of paragraph six criminalize various fraudulent behavior, the next two extend only to the use or possession of counterfeit items. When Congress wanted to include an intent element, it did so. For example, paragraphs 1, 3, 4, and 5 all mention an intent requirement. It seems clear that Congress created these sections with intent requirements in mind that would curb the conduct they sought to restrict. The remainder of the section creates crimes for possession of items that could be used in counterfeiting obligations and securities.

Moreover, the sections surrounding section 474 show that Congress explicitly stated the requisite intent in the text of the statutes for which intent was designed. *See, e.g.,* section 471 prohibits forging, counterfeiting, or altering any obligation with intent to defraud; section 472 restricts passing, uttering, publishing, or selling (or attempting to do so), or importing, possessing, or concealing a forged, counterfeited or altered obligation with intent to defraud; *see also* §§ 473, 477, 484, 491. Congress enacted a comprehensive anti-counterfeiting scheme. Congress included *mens rea* where applicable and strict liability offenses when such would aid in their efforts to drive out counterfeiting.

**40.** Moreover, this court believes paragraph six of section 474 possesses an "element of criminal intent," complying with *Morissette.* This court believes that the proper standard of intent for a violation under paragraph six of section 474 is "knowing." *See United States v. Green,* 962 F.2d 938, 942 (9th Cir.1992).

*Simon,* 412 F.Supp. 426, 430 (W.D.Mo.1974), *aff'd* 534 F.2d 833 (8th Cir.1976) (citing *Koran v. United States,* 408 F.2d 1321, 1325 n. 12 (5th Cir.1969), *cert. denied* 402 U.S. 948, 91 S.Ct. 1603, 29 L.Ed.2d 118 (1971)) (noting differences in the "in the likeness" and "after the similitude" test).

▪ The "similitude" standard, the more stringent of the two standards under section 474, is "whether the fraudulent obligation bears *such a likeness* or resemblance to any of the genuine obligations or securities issued under the authority of the United States as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care dealing with a person supposed to be upright and honest." *United States v. Parr,* 716 F.2d 796, 807 (11th Cir.1983) (citing *United States v. Turner,* 586 F.2d 395, 397 & n. 6 (5th Cir.1978), *cert. denied,* 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 480 (1979)) (emphasis added). Thus, the "in the likeness" test, is a part of the "similitude" test. *Webb v. United States,* 216 F.2d 151, 153 (6th Cir.1954). Both standards are questions of fact for the jury. *Id.; Leib v. Halligan,* 236 F. 82, 85 (9th Cir.1916). Since the facts of this case arguably fit under either provision, the court will consider Boggs' work under the more rigorous "similitude" test.

▪ At a hearing on September 28, 1993, this court viewed the 15 samples of Boggs' work that were seized by the Secret Service.[41] Thereafter, plaintiff submitted a portfolio of his work. Summ.J.Hearing, Plf.'s Ex. 1.[42] The court, having viewed these items and found that they have the general pattern of general currency, including portraits in the middle, federal reserve seals and numbers, treasury seals and numbers, signature blocks and numeric features, in the size and color similar to genuine currency, finds that a jury would be justified, if not compelled, to find that these items were in the

likeness and similitude of genuine United States currency.

This court believes that many of the Boggs Bills could be passed as genuine. Although Boggs prides himself on those characteristics of his bills that distinguish them from real currency, some of the works in question are far too similar to authentic currency for this court to conclude that a jury could not find that a person of average intelligence and ordinary observation could not readily and immediately distinguish them from genuine currency, satisfying the "similitude" standard. Indeed, art with more numerous and egregious distortions have been held to be counterfeit. *See, e.g., Wagner v. Simon,* 412 F.Supp. 426 (W.D.Mo.1975), *aff'd* 534 F.2d 833 (8th Cir.1976).

### c. Wording Covers Boggs' Process and Subject Matter

▪ The first of plaintiff's arguments under this heading is that the "operative language" of the statute only concerns "engraving, photograph, print, or impression." Plf.'s Mem.Mot.T.R.O. & Mot.Prelim.Inj. at 30. Plaintiff claims that the "engraving, photograph, print, or impression" language of paragraph six does not cover hand-drawn pictures and photocopies. Plaintiff argues that the creation of the likeness of the obligation or security requires a *mechanical* process of reproduction. *Id.* at 30–31.

This court declines to follow plaintiff's narrow interpretation of the words "print" and "impression." We believe this statute was intended to cover illustrations and reproductions of currency, regardless of whether hand made or the result of a particular mechanical process. Moreover, many of Boggs' pieces are photocopies of "hand-drawn work that are then hand-inked and signed by the artist." *Id.* at 31. These pieces are the result of a mechanical process and suggest that this statute applies to Boggs' work. The plaintiff's narrow view of the statute does not

---

**41.** These particular samples have been adjudged to be after the similitude and in the likeness of genuine United States currency by Counterfeit Specialist and Questioned Document Examiner Stewart in the Forensic Services Division of the United States Secret Service. *See* Larry Stewart Decl. ¶ 5.

**42.** This portfolio is to remain in the custody of plaintiff's counsel as exhibits in this case until the conclusion of this case, including any appeal. No determination has been made as to whether any items within the portfolio constitute contraband.

prohibit the Service from prosecution under this section.

▪ Finally, plaintiff argues that the fifth paragraph of section 474 applies only to "obligations" and "securities," and that pieces of art are not obligations, "legal instruments evidencing intangible interests in property." *Id.* n. 10. Plaintiff goes on to correctly state that "courts have rejected prosecutions under this and similar statutes for items that did not, on their faces," purport to be obligations or securities. *Id.* (citations omitted).

This argument is wholly without merit. In support of his definition of "security" and "obligation," plaintiff quotes from *Black's Law Dictionary,* suggesting that an obligation evidences a written promise to pay money and a security evidences indebtedness or an investment in a common enterprise. However, 18 U.S.C. § 8 provides the definitions of "obligation" and "security" as used in section 474. This definition expressly includes federal reserve notes.[43] Mr. Boggs' illustrations of currency are covered by this section as well.

## IV. CONCLUSION

This court does not doubt the credentials and talents of Mr. J.S.G. Boggs. One of the purposes behind Boggs' work is to explore issues of trust and value and to question the usefulness and value of art and money. As Boggs states:

> In part, my work is designed to elucidate the idea that the value of money ... should be consciously accepted on the basis of our trust in each other and in our social and political institutions.

This court has viewed plaintiff's work and has carefully considered Mr. Boggs' proposition regarding the value of money. This court accepts Boggs' belief that money is valued, in part, because of our trust of our political institutions. To that end, these political institutions should be given the means by which to establish and maintain the value of United States currency. This court concludes that the provisions of sections 474 and 504 give the Treasury this power without impinging upon Mr. Boggs' constitutional rights.

It is often said that "a picture is worth a thousand words." Unfortunately, Mr. Boggs' works are often worth a thousand dollars.[44] This court finds no bar to the application of the statutory provisions to Boggs and refuses to enjoin any possible enforcement by the Secret Service or United States Attorney's Office.

Having found no material issues of fact, this court finds that sections 474 and 504 are constitutional on their face and as applied to plaintiff. Defendants are entitled to summary judgment as a matter of law. Defendants' motion to dismiss is denied. Plaintiff's cross-motion for summary judgment is denied and the complaint is dismissed.

A separate order shall issue this date.

## ORDER

This case comes before the court on plaintiff's request for preliminary injunctive relief, defendants' motion to dismiss, and cross-motions for summary judgment. For the reasons set forth in an accompanying opinion, it is hereby ORDERED that:

1. Defendants' motion to dismiss is DENIED.

---

**43.** The full text of the statute reads:

> The term "obligation or other security of the United States" includes all bonds, certificates of indebtedness, national bank currency, Federal Reserve notes, Federal Reserve bank notes, coupons, United States notes, Treasury notes, gold certificates, silver certificates, fractional notes, certificates of deposit, bills, checks, or drafts for money, drawn by or upon authorized officers of the United States, stamps and other representatives of value, of whatever denomination, issued under any Act of Congress, and canceled United States stamps.

18 U.S.C. § 8 (1969); *see United States v. Grismore,* 564 F.2d 929, 931–32 (10th Cir.1977), *cert. denied* 435 U.S. 954, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978) ("Section 8, 18 U.S.C. defines the term 'obligation or other security of the United States' to include 'Federal Reserve notes.'").

**44.** As Justice Stevens noted in *Regan:*

> Time notes that one of these pictures may be worth a thousand words; the Government notes one of these pictures or negatives may be worth a thousand dollars.

*Regan,* 468 U.S. at 701, 104 S.Ct. at 3294 (Stevens, concurring and dissenting).

2. Plaintiff's motion for summary judgment is DENIED.

3. Defendants' motion for summary judgment as a matter of law is GRANTED, and this case is hereby dismissed with prejudice.

4. Plaintiff's motion for preliminary injunctive relief is DENIED as moot.

SO ORDERED.