**UNITED STATES of America,**
**Appellant,**

v.

**Dennis S. LEWIS.**

**UNITED STATES of America,**
**Appellant,**

v.

**Leigha T. COTHRAN.**

**Nos. 90–3029, 90–3034.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1990.

Decided Dec. 21, 1990.

Kathleen A. Felton, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Washington, D.C., Asst. U.S. Atty., were on the brief, for appellant in both cases. Robert A. Feitel, Washington, D.C., Asst. U.S. Atty., was also on the brief for appellant in No. 90–3034.

Thomas Abbenante, Washington, D.C. (appointed by this court) for appellee Lewis.

Howard F. Bramson, Washington, D.C. (appointed by this court) for appellee Cothran.

Arthur B. Spitzer and Elizabeth Symonds (for American Civil Liberties Union), James W. Klein, David A. Reiser, David H. Remes, and Barry Coburn, Washington, D.C. (for Public Defender Service for D.C.) were on the joint brief for amici curiae.

Before BUCKLEY, D.H. GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

In these two cases, defendants challenge a new and increasingly common tactic in the war on drugs: Police officers board a commercial bus at an intermediate stop and, with the permission of individual passengers, ask questions, examine identifications and tickets, and conduct searches. Although we have not previously dealt with a Fourth Amendment challenge to this particular technique, we have considered and upheld similar police-citizen encounters aboard trains, *see, e.g., United States v. Brady,* 842 F.2d 1313 (D.C.Cir.1988), in train stations, *see, e.g., United States v. Lloyd,* 868 F.2d 447 (D.C.Cir.1989), and in bus terminals, *see United States v. Winston,* 892 F.2d 112 (D.C.Cir.1989).

Both district judges considered those precedents inapplicable to what they characterized as an "abhorrent police prac-

tice[ ]," *United States v. Lewis,* 728 F.Supp. 784, 790 (D.D.C.1990), one "so intimidating that it compels compliance," *United States v. Cothran,* 729 F.Supp. 153, 158 (D.D.C.1990). A police officer who questions and searches consenting passengers aboard a bus, the judges ruled, commits a *per se* violation of the Constitution that is reminiscent of abuses under George III, Hitler, and Stalin. *See Cothran,* 729 F.Supp. at 157; *Lewis,* 728 F.Supp. at 790. As a consequence, the judges ruled that the evidence secured by the police must be suppressed. Construing the uncontested facts in the light of our well-established precedents, we reverse.

## I. BACKGROUND

### A. *Lewis*

Dennis S. Lewis was indicted on November 9, 1989, on three counts of possession with intent to distribute narcotics in violation of 21 U.S.C. § 841. At a suppression hearing on December 14, 1989, Detective Edward Hanson of the Metropolitan Police Narcotics Interdiction Unit gave the following uncontested testimony.

At about 12:30 p.m. on October 19, 1989, Detective Hanson and two other officers boarded a southbound bus during a layover in Washington, D.C. Detective Hanson displayed his police identification to a passenger, who was later identified as Lewis, and asked if they could talk. Lewis agreed. In response to questions, Lewis displayed his ticket from New York City to Richmond, Virginia; stated that he had been visiting his sick mother; displayed his driver's license; and said that he had no luggage.

Detective Hanson then explained that, as part of the District of Columbia's drug interdiction effort, he was assigned to interview people traveling on public transportation from drug-source cities, including New York City. Lewis said that he understood. The officer asked if he was carrying any narcotics or weapons. Lewis said he was not. The officer then asked for permission to search Lewis's person. Lewis consented and stood up. Upon detecting a large lump in Lewis's left sock, the officer retrieved a packet of white powder,

which was field tested and identified as cocaine. Detective Hanson placed Lewis under arrest. Subsequently, the officer found marijuana in Lewis's jacket pocket, and cocaine, heroin, and related paraphernalia in a bag on the floor near Lewis's seat.

Detective Hanson testified that Lewis cooperated freely and indicated no desire to stop answering questions or to leave the bus. The officer spoke in a low, conversational tone and never told Lewis that he was required to respond. The detective wore plain clothes and did not display a weapon. He returned Lewis's license and ticket after examining them.

The trial court granted the defendant's motion to suppress the contraband. The judge concluded that the initial encounter was an unlawful Fourth Amendment seizure, that the seizure tainted the consensual search, that in any event the consent was not voluntary, and that the practice of randomly questioning bus passengers violates the Fifth Amendment. *See Lewis,* 728 F.Supp. at 786–89.

### B. *Cothran*

On December 14, 1989, Leigha T. Cothran was indicted for possession with intent to distribute a narcotic, in violation of 21 U.S.C. § 841, and for use of a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c). At a January 12, 1990, suppression hearing, Detective Ronnie Hairston, also of the Metropolitan Police Narcotics Interdiction Unit, gave the following uncontested testimony.

At about 6:50 p.m. on November 16, 1989, Detective Hairston and two or three other officers boarded a southbound bus that was making an intermediate stop in Washington. While the other officers questioned people in the front of the bus, Detective Hairston started in the back. He questioned and searched one man, with his consent, and then approached a man and woman in adjacent seats. The man told the officer that they were traveling together. The woman, later identified as Cothran, agreed to talk with the officer, allowed him

to examine her ticket, and said that she had checked all her luggage. With her permission, Detective Hairston took her coat and handbag, searched them, found no contraband, and returned them to her. Hairston testified that when he approached Cothran, he told her he was a police officer and identified himself by showing her his I.D. folder. He used a conversational tone in talking with her; she seemed calm and was cooperative.

The officer proceeded to question others on the bus. Eventually he began inspecting the bags in the overhead luggage racks. He asked Cothran and her companion about a tote bag above their seats. Both denied ownership of it. The detective held it up and asked the other passengers whether any of them owned the bag. No one claimed it. Another officer checked with the driver to be sure that all passengers had reboarded, and then held the bag up and loudly asked if it belonged to anyone on the bus. Again, no one responded.

Treating the bag as abandoned, the police took it outside. A drug-detecting dog indicated that the bag contained narcotics. The officers opened it and found a rocklike substance that tested as cocaine, along with a handgun and a photo of three people, one of whom appeared to be Cothran. She was placed under arrest. At the police station, after being advised of her right to remain silent, she said repeatedly, "I shouldn't have done it for him."

The trial judge excluded from evidence the bag and its contents, as well as Cothran's post-arrest statement. He ruled that the encounter was an unlawful seizure, that Cothran's denial of ownership of the bag was in essence an involuntary consent to its search, and that these Fourth Amendment violations tainted her subsequent statement to the police. *See Cothran*, 729 F.Supp. at 155–57 & n. 3.

## II. DISCUSSION

### A. Seizure

In each case, the district court concluded that the police had seized the defendants in violation of the Fourth Amendment. As these judgments involve questions of law, they are subject to *de novo* review. *See United States v. Maragh*, 894 F.2d 415, 417–18 (D.C.Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990). We find that the courts erred.

■ It has long been clear that police do not "seize" every citizen whom they approach. Rather, a seizure arises "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). In determining whether a defendant's liberty has been restrained, we ask whether a reasonable person would have felt free to leave, *see Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988), or would have felt free to "disregard the police presence and go about his business," *id.* at 576, 108 S.Ct. at 1981. The reasonable person we posit is, of course, innocent of any crime. *See United States v. Joseph*, 892 F.2d 118, 121 (D.C.Cir.1989).

■ This analysis takes into account all the objective circumstances of the encounter, for "what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut*, 486 U.S. at 573, 108 S.Ct. at 1979 (internal quotes in original). Relevant factors include the time of day, the place, the officer's tone of voice, and whether the officer displayed a weapon or handcuffs, wore a uniform, touched the individual without permission, threatened or physically intimidated him, or retained his identification or travel ticket. *See, e.g., United States v. Tavolacci*, 895 F.2d 1423, 1424–26 (D.C.Cir.1990) (opinion for a divided panel); *Maragh*, 894 F.2d at 418.

Applying these factors, we have repeatedly concluded that no seizure arises when officers, "displaying no weapons and speaking in a normal tone of voice, approach individuals in a public place and ask permission to talk with them." *United States v. Morgan*, 914 F.2d 272, 274 (D.C.

Cir.1990) (per curiam); *see also United States v. Smith*, 901 F.2d 1116, 1117–18 (D.C.Cir.) (citing additional cases), *cert. denied*, —— U.S. ——, 111 S.Ct. 172, 112 L.Ed.2d 136 (1990). Indeed, "police questioning, by itself, is unlikely to result in a Fourth Amendment violation." *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984).

The present cases differ from others in which we have found no seizure only in that the consensual interrogations took place aboard a bus. Both trial judges found that difference dispositive. They ruled that the defendants were not "free to leave"—and, therefore, were seized for Fourth Amendment purposes—because leaving would have required them to squeeze past police officers in the aisle and to risk missing the bus's departure. In *Lewis*, the judge stated:

> To walk away from [his encounter with Detective Hanson], Mr. Lewis ... would have had to stand up from his seat, work his way out of the narrow row in which he was situated, and then negotiate his way past Detective Hanson, who was positioned in the narrow exit aisle. In effect, he would have had to leave the bus, give up his seat, and lose his ability to travel to Richmond according to his travel plans. To suggest that Mr. Lewis was objectively free to leave in such circumstances is to stretch reality beyond the limits of constitutional propriety.

*Lewis*, 728 F.Supp. at 787 (footnote omitted). Similarly, in *Cothran*, the judge contrasted the circumstances encountered by bus and train passengers as follows:

> The defendant in this case was sitting in a cramped bus cabin and would have required the permission of each of the officers to squeeze past them in the narrow aisle.
>
> In fact, defendant, in contrast with an Amtrak passenger, could not hope to avoid the officers' scrutiny without getting off the bus and risking missing its departure, not a viable option for a reasonable person in her situation....
>
> . . . .

In this situation, a reasonable, innocent person would not feel free to leave.

*Cothran*, 729 F.Supp. at 155–56 (citation omitted).

We consider first the physical constraints imposed by the layout of the buses. As both judges noted, bus cabins are cramped and have narrow aisles. *See Lewis*, 728 F.Supp. at 787; *Cothran*, 729 F.Supp. at 155. Detective Hanson testified that he did not block Lewis from leaving his seat. The officer said that "[t]here was plenty of room for [Lewis] to stand up and walk through," although he might have "brushed against me." The other officers were standing farther back in the bus, so Lewis would not have had to pass by them. In *Cothran*, Detective Hairston testified that he stood "right next" to Cothran and leaned over her. From the record it appears that two or three other officers were standing in the aisle between her and the door.

■ We have previously considered police-citizen encounters in the confined settings of train interiors. In four cases, we found that no seizures had occurred when police questioned a train passenger in a coach car, a lounge car, and from the doorway of a sleeping compartment. *See Tavolacci*, 895 F.2d at 1425 (presence of officers in doorway between roomette and aisle did not "signify an intent to prevent the interviewee" from leaving scene); *United States v. Savage*, 889 F.2d 1113, 1115–18 (D.C.Cir.1989) (presence of officers in compartment doorway would not prevent reasonable person from declining to talk to officer or from leaving compartment); *United States v. Carrasquillo*, 877 F.2d 73, 75–76 (D.C.Cir.1989) (defendant questioned in coach car); *Brady*, 842 F.2d at 1314–15 (encounter initiated in lounge car). In the one train case where we held that a seizure had occurred, we emphasized that the encounter had taken place at 6:30 a.m. and that the officers had apparently retained the passenger's identification. *See United States v. Battista*, 876 F.2d 201, 204–05 (D.C.Cir.1989).

In all of the train cases, we found the location relevant but far from decisive.

Significantly, we noted that the reasonable citizen we posit lacks a "'guilty mind, which is especially prone to apprehensions of confinement.'" *Savage,* 889 F.2d at 1116 (quoting *Brady,* 842 F.2d at 1315 n. 3).

To be sure, one element of the seizure inquiry is whether the police surround the person or otherwise restrict his ability to leave. *See Chesternut,* 486 U.S. at 575, 108 S.Ct. at 1980; *United States v. Bowles,* 625 F.2d 526, 532 (5th Cir.1980). Police constraints on an individual's freedom of movement can be a significant factor.

Where the constraints originate elsewhere, however, the factor is less decisive. A bus passenger has voluntarily placed himself in tight quarters, with a single avenue of exit that is narrow and frequently blocked by people and luggage. For this cramped setting, he cannot blame law enforcement officers. In this setting, moreover, the aisle next to the seat is the logical place for someone who wants to talk with the passenger to position himself. For the defendants here, as for people questioned on trains, "[t]he detectives' positions were compelled by the location in which they were conducting their interview; there was no other place for them to stand." *Savage,* 889 F.2d at 1117; *see also Tavolacci,* 895 F.2d at 1425.

Much the same can be said about a passenger's desire to remain in his seat as the departure time draws near: The constraint is simply not of the officers' making. *Cf. Delgado,* 466 U.S. at 218, 104 S.Ct. at 1763 (holding that no seizure occurred when INS agents positioned themselves near factory exits, and noting that "[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers"). Because the constraint does not "arise from conduct of the police or from some show of authority," *Joseph,* 892 F.2d at 121, it does not create a seizure.

In light of these authentic but nonpolice-related constraints on a bus passenger's freedom of movement, the proper question is whether the passenger is "free to disregard the police presence and go about his business." *Chesternut,* 486 U.S. at 576, 108 S.Ct. at 1981. As the Fourth Circuit recently held in a case involving a similar bus encounter,

> [i]n this context, freedom to leave means fundamentally the freedom to break off contact, in which case the officers must, in the absence of objective justification, leave a passenger alone.

*United States v. Flowers,* 912 F.2d 707, 712 (4th Cir.1990); *see also United States v. Hammock,* 860 F.2d 390, 392–93 (11th Cir.1988) (bus encounter did not amount to arrest); *Savage,* 889 F.2d at 1117 n. 3 (no seizure occurred where defendant "was in the sleeper car of his train, unrestrained from going about his 'ordinary business' of sitting in the car") (internal quotes in original).

The evidence before us does not suggest that a reasonable bus passenger would find his "business" impeded by the officers' questioning. The officers neither wore badges nor carried visible weapons. *Compare Bostick v. State,* 554 So.2d 1153, 1154, 1157 (Fla.1989) (seizure occurred aboard a bus where officers wore badges and raid jackets, and one officer held a pistol in a zipper pouch), *cert. granted,* —— U.S. ——, 111 S.Ct. 241, 112 L.Ed.2d 201 (1990). Although Detective Hairston testified that he might report an uncooperative passenger to authorities at the next bus stop, he did not inform Cothran of that possibility. We find nothing in the record that would cause a passenger to believe that unless he cooperated fully, the police would subject him to harassment at subsequent stops or restrain him when he reached his destination; indeed, according to the testimony of Detective Hairston, about one in five passengers declines to cooperate. Nevertheless, the court in *Cothran* remarked that

> if the through passengers on the bus that evening suspected what the Court learned at the motions hearing, it would have been clear to them that they were also not free to refuse the police request to search. The evidence disclosed that

refusal to cooperate is sometimes treated as an admission of guilt.

*Cothran*, 729 F.Supp. at 156; *see also Lewis*, 728 F.Supp. at 790 (speculating on same possibility).

There are several problems with this statement. First, the seizure inquiry, as well as the inquiry into the voluntariness of consent to a search, focuses on what the citizen has reason to know, not on the officer's secret intentions. *See Chesternut*, 486 U.S. at 575 n. 7, 108 S.Ct. at 1980 n. 7; *Carrasquillo*, 877 F.2d at 77 n. 3. There is no evidence here that the passengers believed that if they refused to cooperate, the officers might alert police at a subsequent stop of their "suspicious" behavior. *See Cothran*, 729 F.Supp. at 156. Second, it is clear that a mere refusal to cooperate cannot spawn the reasonable suspicion required to justify more intrusive police methods, and no such claim is presented here. *See Delgado*, 466 U.S. at 216, 104 S.Ct. at 1762 (citing *Brown v. Texas*, 443 U.S. 47, 51–52, 99 S.Ct. 2637, 2640–2641, 61 L.Ed.2d 357 (1979) (without reasonable suspicion, police may not detain individual who refuses to identify himself)). Therefore, the *Cothran* court's rhetorical flourish—"no responsible federal judge can cooperate with ... a system which permits the exercise of a constitutional right to be treated as an admission of guilt," *Cothran*, 729 F.Supp. at 158—has no basis in fact or law.

In *Lewis*, the court complained that the performance of a body search in public was "patently offensive." *Lewis*, 728 F.Supp. at 790. It may have been, but that begs the constitutional question. Lewis consented to the search, and that consent, rather than any resulting embarrassment, is the constitutionally relevant point. It is also true that these bus encounters will expose significant numbers of law-abiding passengers to random questioning by the police, *id.* at 788. The experience may well cause anxiety. There is, however, nothing unconstitutional about such encounters so long as the passengers' freedom to decline the interview and to go about their business has not been restrained "by physical force

or a show of authority." *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16.

Therefore, taking all of the circumstances of these encounters into consideration, we conclude that they did not constitute Fourth Amendment seizures.

### B. Remaining Issues

As the evidence discovered in these encounters was not the product of illegal seizures, we must now examine the alternative grounds given by the judges for its suppression. Specifically, we must determine whether the cocaine discovered in the course of the Lewis body search, the cocaine and revolver found in Cothran's disclaimed tote bag, and the post-arrest statement she made to the police were the products of a nonconsensual search and an involuntary abandonment. We must also address the *Lewis* court's assertion that the program of bus encounters violates the Fifth Amendment. We discuss these questions in turn.

#### 1. The body search

 Consensual searches fall outside the Fourth Amendment's warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). The prosecution bears the burden of proving that consent was voluntary. *Id.* at 222, 93 S.Ct. at 2045. Voluntariness depends on an assessment of

> the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.... [F]actors taken into account have included the youth of the accused; his lack of education ... or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.... While the state of the accused's mind, and the failure of the police to advise the accused of his rights, [are] certainly factors to be evaluated in assessing the "voluntariness" of an accused's respons-

es, they [are] not in and of themselves determinative.

*Id.* at 226–27, 93 S.Ct. at 2047–48 (citations and footnote omitted). As this list suggests, the analysis focuses on the particular individual rather than on a hypothetical reasonable person. Because of the fact-bound nature of the inquiry, we generally reverse a trial judge's finding only for clear error. *See Lloyd,* 868 F.2d at 451.

Although the trial judge ruled that the evidence discovered as a consequence of Lewis's body search must be suppressed because it was tainted by an unconstitutional seizure, the judge also found that Lewis's consent to the search was involuntary. *See Lewis,* 728 F.Supp. at 787–88. The judge explained:

> Mr. Lewis found himself in a situation in which his exit from ... his seat on the bus was inhibited. In addition, he was seated while Detective Hanson stood above him and to his side. After having satisfactorily responded to all the questions put to him by Detective Hanson, Mr. Lewis was next confronted with a request to perform a body search. As the questions advanced by Detective Hanson became increasingly more intrusive, the level of anxiety and duress that pervaded the situation necessarily escalated. *This Court is convinced that most citizens would react in this manner given the circumstances present in this case. This is [a] natural reaction that applies equally to those who have something to hide as it does to those law abiding citizens who simply believe that they cannot, given the circumstances, say "No" or otherwise refuse to comply with a police officer's request.*

*Id.* at 788 (emphasis added).

■ This analysis contains none of the detail suggested in *Schneckloth.* It does not inform us why this particular defendant, Dennis S. Lewis, felt compelled to comply with the officer's request. Rather, as the italicized portion makes clear, it relies on the judge's perception of how bus passengers would generally respond to the kind of questioning employed by Detective Hanson. We conclude, as did the Eleventh

Circuit under similar circumstances, that here

> the trial court found as a matter of law, rather than fact, that because of what he perceived as inherently coercive conditions, [defendant's] consent to the search could not have been voluntary.

*United States v. Garcia,* 890 F.2d 355, 359–60 (11th Cir.1989) (footnote omitted). Accordingly, like the court in *Garcia,* "we will review the judge's finding of voluntariness *de novo,*" *id.* at 360, and determine, on the basis of the uncontroverted evidence taken as a whole, whether Lewis's consent was voluntary.

■ We note, first, that any restrictions on Lewis's freedom of movement were the result of his location in the bus and not of any effort by the police to impede his egress. *See* discussion at 1299. Furthermore, at the suppression hearing, Detective Hanson testified that Lewis cooperated throughout the encounter and that he consented to the search without hesitation. Nothing in the officer's testimony suggests that the search exceeded the bounds of Lewis's consent. No one else testified at the hearing, and the judge described the officer as "a credible witness."

In short, the record offers no support for the conclusion that Lewis's consent was involuntary. The transcript of the suppression hearing contains nothing "to contradict the prosecution's showing that the consent 'was in fact voluntarily given, and not the result of duress or coercion, express or implied.'" *Winston,* 892 F.2d at 118 (quoting *Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2059). Because "the record permits only one resolution of the factual issue," *Pullman–Standard v. Swint,* 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982), we reverse the trial court's finding and hold that Lewis validly consented to the search.

*2. The disclaimed tote bag*

In *Cothran,* the government justified the removal of the bag and its subsequent search on the basis that it had been abandoned. *See Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668

(1960) (warrantless search or seizure of abandoned property not a violation of Fourth Amendment); *Brady,* 842 F.2d at 1315 (involving warrantless search of disclaimed property). In determining that the evidence must be suppressed, however, the judge decided that the issue to be resolved was whether Cothran had consented to the search of the bag, not whether she had abandoned it. He reasoned as follows:

> Having permitted the police to check her papers and search her purse and coat, a reasonable innocent person would feel compelled to permit a further search of a tote bag or to deny ownership of the bag; to do otherwise would signal to the suspicious officers that she had something to hide.
>
> . . . .
>
> By disavowing ownership of her tote bag the defendant permitted the police to search it.

*Cothran,* 729 F.Supp. at 156–57. The judge then proceeded to weigh "the totality of factors" to determine whether that permission had been freely given:

> The defendant is 20 years old. There is no indication that she has previously been involved with the law. She had not been informed of rights, she did not feel free to leave, and despite her calm manner in answering questions, Detective Hairston had searched her purse and coat. Considering the totality of circumstances, her consent was not voluntary.

*Id.* at 157.

The judge's conclusion is flawed because it is based on the unstated premise that the police created the dilemma that caused Cothran to deny ownership of the bag. The dilemma, however, was of her making. No one suggests that Cothran's earlier consent to the search of her purse and coat had been other than voluntary; but it was that consent—not police coercion or misfeasance—that gave rise to her quandary. *Cf. Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) (though trial court found that confession was compelled by defendant's mental illness, confession is nevertheless admissible because it did not result from "any coercion brought to bear on the defendant by the State"). Consequently, the analysis that led the judge to find that Cothran had not consented to the search of the bag was based on a misinterpretation of the facts and, as a result, a misreckoning of the law. When Detective Hairston asked her if she owned the tote bag on the rack above her head, Cothran said "no," she did not. She did not say "yes," she would permit it to be searched. Thus, the law to be applied is that of abandonment.

■■■■■ When an individual abandons property, he forfeits any reasonable expectation of privacy in it; consequently, police may search it without a warrant. *See United States v. Thomas,* 864 F.2d 843, 845 (D.C.Cir.1989). Abandonment for purposes of the Fourth Amendment differs from abandonment in property law; here, the analysis examines the individual's reasonable expectation of privacy, not his property interest in the item. *See id.* at 845–46. Thus, it is irrelevant that Cothran might have repossessed the bag if the detective had not taken it.

A voluntary denial of ownership demonstrates sufficient intent of disassociation to prove abandonment. *See, e.g., Carrasquillo,* 877 F.2d at 76; *Brady,* 842 F.2d at 1316. Voluntariness is gauged according to " 'words spoken, acts done, and other objective facts.' " *Thomas,* 864 F.2d at 846 (quoting *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir.1973)). An abandonment may be involuntary, and thus invalid, where it results directly from police misconduct, such as an illegal search or seizure, deceit, or, perhaps, a pattern of harassment. *See Thomas,* 864 F.2d at 846 n. 4; *Brady,* 842 F.2d at 1315 n. 7; 1 W. LaFave, *Search and Seizure* § 2.6(b), at 471–74 (2d ed. 1987).

Although the trial judge did not directly address the question of abandonment, he stated in a footnote that Cothran's denial of ownership had been suppressed because it "was involuntary, came in response to a police question while she was deprived of her freedom of action and prior to recital of her rights." *Cothran,* 729 F.Supp. at 157 n. 3. As it is not clear whether the judge

had a basis for finding her denial involuntary other than that it had been tainted by an illegal seizure, we will examine the record.

Detective Hairston testified that after questioning other passengers, he returned to Cothran and asked if she owned the tote bag over her seat. According to the officer: "She said it was not her bag." On appeal, Cothran faults the police for failing to ask her permission before searching the bag. The police, however, were obliged only to get the consent of the bag's owner, a status that Cothran had specifically disclaimed. Cothran further suggests that voluntary abandonment is impossible after an illegal seizure. In light of our conclusion that no seizure occurred here, we do not reach this issue.

Once again, the record depicts an unambiguous factual scenario. *See Pullman–Standard v. Swint*, 456 U.S. at 292, 102 S.Ct. at 1792. There is no dispute that Cothran denied ownership of the bag, and no suggestion that her denial was occasioned by any actions that can properly be labeled police misconduct, deception, or coercion. We conclude that she abandoned the bag, that the warrantless search was proper, and that the evidence is admissible.

### 3. The suppressed statement

The district court ordered the suppression of the statement that, according to Detective Hairston, Cothran had made at the police station: "I shouldn't have done it for him." The court suppressed it because it was "the product of the unlawful seizure and her involuntary denial of ownership of the bag." *Cothran*, 729 F.Supp. at 157 n. 3. As we have found that no seizure took place and that Cothran's disclaimer of ownership was voluntary, we also find that the court erred in suppressing her statement.

### 4. The Fifth Amendment

In *Lewis*, the trial judge asserted that these bus encounters violate the Fifth Amendment:

In my opinion, the Fifth Amendment to the Constitution is transgressed when police officers engage in a concerted planned program that involves random indiscriminate stopping, questioning, and searching individuals with the clear purpose to obtain from their lips and their bodies information and evidence that would incriminate them.

*Lewis*, 728 F.Supp. at 789.

■ The judge cited no authority for the proposition that the Fifth Amendment prohibits consensual encounters and the production of noncoerced evidence, and for good reason: the relevant case law points in the opposite direction. First, it is well established that noncustodial interrogation will not itself trigger the Fifth Amendment. *See, e.g., United States v. Beckwith*, 510 F.2d 741, 741–42 (D.C.Cir.1975), *aff'd*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *United States v. Hall*, 421 F.2d 540, 544 (2d Cir.1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970). Nothing more appears on the record here. Second, the Fifth Amendment prohibits only the compelled production of testimonial evidence. *See Andresen v. Maryland*, 427 U.S. 463, 470–73, 96 S.Ct. 2737, 2743–45, 49 L.Ed.2d 627 (1976); *Fisher v. United States*, 425 U.S. 391, 409, 96 S.Ct. 1569, 1580, 48 L.Ed.2d 39 (1976). The defendants here were not coerced into producing evidence; and the principal evidentiary fruits of these encounters—Lewis's drugs, and Cothran's drugs, gun, and photo—were not testimonial in nature. Finally, if the judge meant to suggest that an officer must issue a *Miranda* warning before asking permission to search an individual, "every federal circuit court that has addressed the question has reached the opposite conclusion." *United States v. Glenna*, 878 F.2d 967, 971 (7th Cir.1989) (citing cases).

### III. CONCLUSION

Both trial judges warned that the war on drugs must not be permitted to erode our constitutional liberties. *See Cothran*, 729 F.Supp. at 157–58; *Lewis*, 728 F.Supp. at 788–91. This admonition deserves frequent reiteration. Yet we must also keep in mind that "the measure of constitutional adjudication is the ability and willingness to dis-

tinguish between real threat and mere shadow." *Abington Township School Dist. v. Schempp*, 374 U.S. 203, 308, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring). As we discern no real threat here, and as we find that the police acted within constitutional bounds, we reverse the district courts' suppression orders and remand for further proceedings consistent with this opinion.

*So ordered.*