**J.S.G. BOGGS, Plaintiff,**

v.

**Lewis C. MERLETTI,[1] et al., Defendants.**

**No. CIV.A. 93–1845(RCL).**

United States District Court,
District of Columbia.

Oct. 29, 1997.

---

1. Under Fed.R.Civ.P. 25(d)(1), this court hereby orders the substitution of the current Director of the United States Secret Service as a defendant in this action.

Kent A. Yalowitz, Philip W. Horton, Bruce R. Kelly, Marla Eisland, Washington, DC, for Plaintiff.

Charles F. Flynn, Asst. U.S. Atty., Michael Ryan, Asst. U.S. Atty., U.S. Attorney's Office, Washington, DC, for Defendants.

*MEMORANDUM OPINION*

LAMBERTH, District Judge.

This matter comes before the court on cross-motions for summary judgment on plaintiff's claim for the return of his seized property. Upon consideration of the parties' statements of points and authorities, affidavits, declarations and exhibits, and this court's *in camera* review of the property in dispute, plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted.

## I. BACKGROUND

### A. FACTUAL BACKGROUND

J.S.G. Boggs ("Boggs") is an artist and academic with an appointment at Carnegie–Mellon University whose greatest acclaim—in both the artistic and legal worlds—derives from his drawings of United States and foreign currency ("Boggs Bills"). Many of these reproductions are actual size, *trompe l'oeil* pieces on which Boggs alters some of the design elements from genuine bills, such as replacing the signature of the Secretary of the Treasury with his own, changing the portrait on the front, or creating a denomination that does not exist. Boggs travels the country bartering his work for goods and services by explaining to merchants that he is an artist. Affidavit of J.S.G. Boggs at 2–3. His chosen means of artistic expression has been the subject of substantial media interest, including coverage in *The New York Times, The Washington Post* and *The London Times,* as well as NBC, CBS, ABC and PBS television.

The United States government has also taken an interest in Boggs' artistic pursuits, an interest which has been a source of significant consternation and frustration for him for almost all of this decade. The specific events relevant to this matter began in March 1991, when the Secret Service learned that Boggs was attempting to obtain merchandise from a Cheyenne, Wyoming K–Mart using one of his Boggs Bills. Declaration of Special Agent Jerry P. Henson at 2. Secret Service agents subsequently met with Boggs in his hotel room, and left this encounter with fifteen Boggs Bills samples. At that time Boggs was advised that the pieces appeared to be in violation of federal counterfeiting statutes. As of this date, the government has not returned the samples taken in Wyoming, alleging that they violate Chapter

25 of Title 18 of the U.S. Code and are contraband.

In November 1992, the Secret Service became aware that Boggs had printed $1 million in Boggs Bills and was planning on using them in the greater Pittsburgh area as part of "Project Pittsburgh," in which Boggs was planning to ask people to spend the bills five times before taking them out of circulation. Affidavit of Thomas M. Abraham in Support of Application for Search Warrant at ¶ 17. In December of that year, pursuant to a warrant issued by the chief magistrate of the Western District of Pennsylvania, Secret Service agents conducted a search of Boggs' person, studio and residence, seizing a large quantity of Boggs Bills as well as hundreds of other items. In a December 8, 1992 meeting with the Secret Service, Boggs was advised that many of the seized items appeared to be in violation of counterfeiting statutes and that prosecution was a possibility. On March 3, 1995, the United States Attorney for the Western District of Pennsylvania declined to prosecute Boggs. *See* Letter from Charles F. Flynn, Assistant U.S. Attorney, to Kent Yalowitz, Esq. (April 14, 1995) ("Flynn Letter"). As of this date, the government has not returned the Boggs Bills taken in Pittsburgh, alleging that they are contraband, though they have offered to return other items (presumed to be non-contraband) taken in the seizure.

Plaintiff filed suit in September 1993, stating two claims for relief. In the first claim, plaintiff sought declaratory and injunctive relief, contending that the Secret Service's past actions and threatened prosecutions were causing him to suffer irreparable injury constituting a violation of his First Amendment rights. In *Boggs v. Bowron*, 842 F.Supp. 542 (D.D.C.1993) ("*Boggs v. Bowron*"), *aff'd*, 67 F.3d 972 (D.C.Cir.1995) (unpublished table decision) this court held that 18 U.S.C. §§ 474 and 504—the counterfeiting statutes which the Boggs Bills allegedly violate—were both facially constitutional and constitutional as applied to Boggs. *Id.* at 562. Defendants were awarded summary judgment as a matter of law. Plaintiff now asks this court to address the second claim for relief and order the Secret Service to return the Boggs Bills seized in Cheyenne and Pittsburgh. The gravamen of Boggs' contention is that in executing these two seizures, the Secret Service failed to comply with the special procedural protections established for presumptively expressive materials. These protections include a more strictly applied warrant requirement and a right to a prior adversarial hearing on notice before an independent judicial officer. For the Secret Service's failure to comply with these protections, Boggs contends that the proper remedy is return of the items.

## II. ANALYSIS

### A. The Seizures Did Not Violate the Constitution

#### 1. The Cheyenne "Encounter" Was Not a Seizure

Plaintiff claims that in the Cheyenne seizure, "the government acted without a warrant. Under *Roaden* [*Roaden v. Kentucky*, 413 U.S. 496, 504–05, 93 S.Ct. 2796, 2801–02, 37 L.Ed.2d 757 (1973) ], that ends the matter." Plaintiff's Statement of Points and Authorities at 9. This court does not agree that the constitutional analysis can be so summarily concluded. The validity of the government's conduct in Cheyenne first turns on whether the events that transpired in March 1991 constitute a Fourth Amendment 'seizure' such that the warrant requirement is triggered. Consent is one of the major established exceptions to the warrant requirement, *see, e.g. Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973); *United States v. Lewis*, 921 F.2d 1294, 1300 (D.C.Cir. 1990). The possibility that both the entry into the hotel room and the seizure of the samples were done with Boggs' consent is implicated by both the government's and Boggs' depiction of the Cheyenne encounter.

According to plaintiff's Rule 108(h) Statement of Material Facts as to Which There is No Issue, ¶ 10, the authorities "appeared at Boggs' hotel room door without a warrant. They left with fifteen pieces of Boggs' art." The court is asked to conclude from this two sentence description of the encounter and nothing else that an unconstitutional search and seizure occurred. The government, on

the other hand, construes the initial appearance and entry of the agents as a "visit." *See* Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment at 2. As to the taking of the sample reproductions of Boggs' work, the Secret Service contends that Boggs voluntarily handed over the samples. *Id.*

Even taking the two characterizations and all of the evidence before the court in the light most favorable to plaintiff, this court does not find that the events that transpired in Cheyenne constitute a Fourth Amendment seizure such that the warrant requirement was triggered. First, there is no indication from any of the materials offered in support of plaintiff's summary judgment motion that the government's initial entry into the hotel room was anything but consensual. In Boggs' complaint, he states only that the Secret Service "appeared at [my] hotel room door …" Plaintiffs Verified Complaint ¶ 11. The Secret Service, in describing the entry into the room, states, "[u]pon knocking on the door, identifying ourselves and explaining the purpose of our visit, Mr. Boggs invited us into his room." Declaration of Special Agent Jerry P. Henson at ¶ 7 ("Henson Declaration"). These two characterizations are not incompatible, let alone contradictory, as the Secret Service's description of their entry does include an "appearance" at the hotel room door. The fact that plaintiff has not offered any evidence that the agents' entry into the room was nonconsensual, or at all contrary to Agent Henson's portrayal, leads this court to conclude that there is no such evidence. The fact that Boggs may have been surprised or less than delighted by the Secret Service visit at the moment of their arrival does not by itself implicate the Fourth Amendment warrant requirement. This court cannot hold, in the absence of at least some evidence to the contrary, that the Secret Service's entry into Boggs' Cheyenne hotel room was a nonconsensual entry requiring the agents to have previously obtained a warrant.

■ Having concluded that the entry into the room was consensual and did not trigger the Fourth Amendment warrant require-

ment, the second question to address is whether Boggs' relinquishment of the fifteen samples was also consensual. Boggs' complaint states that in response to their demand for his entire inventory of art, Boggs offered the agents a single example of each type of work. Verified Complaint at ¶ 11. After what Boggs describes as "several hours of tense negotiation, during which it appeared to Boggs that he would be arrested and prosecuted for the content of his art," the agents agreed to take only fifteen Boggs Bills samples. *Id.*

■ Agent Henson's description of what transpired diverges from Boggs' account:

> Boggs was asked if he had samples of his reproductions available in his room. He provided a quantity of reproductions that he obtained from a briefcase in his room…. Mr. Boggs was advised that the reproductions appear to be in violation of counterfeiting statutes and were subject to seizure. At no time during this visit was Mr. Boggs ever threatened with arrest. However, Mr. Boggs was requested to provide a general sampling of his bills and he subsequently gave fifteen samples of his reproductions.

Henson Declaration at §§ 7–8. Based upon these conflicting accounts, there are two bases upon which this court concludes that the relinquishment of the Boggs Bills did not constitute a Fourth Amendment seizure. It is true that coercion invalidates the consent exception for searches and seizures, *see, e.g., Schneckloth,* 412 U.S. at 225–26, 93 S.Ct. at 2046–47 (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)) ("if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process"). However, plaintiff has not pointed to any specific statement or conduct on the part of the Secret Service such that this court could conclude that the government obtained the samples through coercion. Plaintiff did state that he feared arrest, but he offers no basis whatsoever for that fear, an omission that is especially problematic in light of the fact that Agent Henson's sworn statement affirmatively indicates that Boggs was never threat-

ened with arrest. Without any evidence of coercion, threatening statements, or hints of arrest, this court cannot conclude that the relinquishment of the fifteen samples was anything but consensual.

Second, none of the samples turned over to the Secret Service were the product of the alleged "several hours of tense negotiation." According to Boggs' chronology of the events in the Cheyenne hotel room, the Secret Service first demanded all of the Boggs Bills, but rather than absolutely denying their request and sending the agents away (an act which would have been within his right), he *offered* them "a single example of each type of work." Verified Complaint ¶ 11. It is undisputed that at the conclusion of the encounter in the hotel room, the government left with only the fifteen samples originally offered by Boggs—nothing more. In other words, rather than Boggs succumbing to the pressure of the Secret Service, the Secret Service succumbed to him. Even if there were several hours of tense negotiation during which Boggs was subjectively in fear of arrest, none of the Boggs Bills at issue were obtained as a result of that "pressure." Since all the government took was that which Boggs offered at the outset, this court fails to see how the government's seizure could be characterized as the product of coercion.

Because this court finds that the Secret Service' was in Boggs' hotel room with his permission, and that Boggs voluntarily provided the fifteen samples to the agents, this court holds that the Cheyenne encounter was not a Fourth Amendment seizure. The government's actions in March 1991 did not violate plaintiff's constitutional rights, as the entire Cheyenne encounter falls under the consent exception to the warrant requirement.

2. An Adversarial Proceeding on Notice was Not Required Prior to the Issuance of the Pittsburgh Warrant

▇ The events that transpired in Pittsburgh do require this court to consider whether proper Fourth Amendment procedural safeguards were followed prior to the seizure of Boggs' 2 presumptively expressive materials.[2] In Pittsburgh, the Secret Service obtained warrants for Boggs' residence, person and studio; there is no dispute that both a "search" and a "seizure," as those terms are commonly understood, occurred. The question for this court is whether the magistrate's authorization of the warrant afforded the proper rigorous procedural protections and was based on sufficient information so as to ensure against the unjustified suppression of legitimate First Amendment speech.

▇ When the subject matter of a search is expressive material, the potential for a seizure to act as a *de facto* prior restraint of that speech requires a more searching inquiry before issuing a warrant. "Thus, while it is the general rule under the Fourth Amendment that any and all contraband, instrumentalities and evidence of crimes may be seized on probable cause, it is otherwise when materials presumptively protected by the First Amendment are involved." *Fort Wayne Books v. Indiana,* 489 U.S. 46, 63, 109 S.Ct. 916, 927–28, 103 L.Ed.2d 34 (1989) (recognizing the risk of prior restraint); *see also Roaden v. Kentucky,* 413 U.S. 496, 501, 93 S.Ct. 2796, 2799–2800, 37 L.Ed.2d 757 (1973) ("A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material."); *Marcus v. Search Warrant,* 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).

Plaintiff contends that for the government to seize his art *en masse,* as occurred in Pittsburgh, the government was required to first secure judicial approval in an adversary hearing on notice. As authority for this proposition, plaintiff cites *Fort Wayne Books,* 489 U.S. at 63, 109 S.Ct. at 927–28. However, this court finds that the concerns triggering the need for the pre-seizure adversary hearing in that and similar cases are not present in the Pittsburgh seizure.

---

2. In *Boggs v. Bowron,* this court held that the Boggs Bills were expressive materials, presumptively protected by the First Amendment. *Boggs v. Bowron,* 842 F.Supp. at 551. That holding is "law of this case" for this analysis, and this court will proceed under the presumption that "Mr. Boggs has a First Amendment right to create illustrations of United States currency absent constitutionally permissible overriding considerations." *Id.*

*Fort Wayne Books,* along with *Roaden, Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973), *Huffman v. United States,* 470 F.2d 386, 392 (D.C.Cir. 1971) and the other cases cited in support of plaintiff's argument that additional process is demanded for warrants covering expressive materials have one common thread—they are obscenity cases. The probable cause determination in such cases centers around whether the subject of the potential seizure violates an obscenity statute. This court agrees that obscenity cases do provide a good starting point for the analysis that the court is undertaking here, as they present the paradigm situation in which presumptively expressive materials are routinely seized, raising the specter of prior restraints and censorship pending prosecution.

 The analogy is not a perfect one, however. The rationale behind requiring special procedures (such as *in camera* review or adversary hearings on notice) before authorizing a seizure pursuant to an obscenity statute is that a determination as to whether a photo, film or book is obscene (and therefore unprotected) versus only pornographic (and therefore protected) is inherently *subjective.* "Because the line between protected pornographic speech and obscenity is dim and uncertain, a State is not free to adopt whatever procedures it pleases for dealing with obscenity, but must employ careful procedural safeguards to assure that only those materials adjudged obscene are withdrawn from public commerce." *Fort Wayne Books,* 489 U.S. at 79, 109 S.Ct. at 936 (citations omitted); *see also Roth v. United States,* 354 U.S. 476, 488, 491, 77 S.Ct. 1304, 1310–11, 1313–14, 1 L.Ed.2d 1498 (1957) (recognizing the complexity inherent in determining whether materials are obscene). "The line between speech unconditionally guaranteed and speech which may be legitimately regulated, suppressed or punished is finely drawn. The separation of legitimate from illegitimate speech calls for ... sensitive tools." *Marcus,* 367 U.S. at 730–31, 81 S.Ct. at 1715–16. If obscenity seizures were to be authorized on nothing more than an officer's affidavit, the affiant would have substantial, if not exclusive power to make the difficult determination as to whether the material in question taken as a whole, appeals to the prurient interest in sex, or portrays in a patently offensive way, sexual conduct specifically defined by the applicable state law. *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). For a magistrate or other judicial officer to make a probable cause determination based merely on the bald affidavit of a police officer presents too much of a possibility that the subjective impression of that police officer will act as a prior restraint on protected speech. It is the evaluative aspect and sensitivity inherent in making an obscenity determination that requires a magistrate to have more that the officer's word at his or her disposal. "When presumptively protected materials are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field." *Zurcher v. Stanford Daily,* 436 U.S. 547, 564, 98 S.Ct. 1970, 1980–81, 56 L.Ed.2d 525 (1978).

 The difficulty encountered in determining whether materials are obscene is not present when determining whether materials might violate counterfeiting statutes. While an obscenity determination requires *evaluation,* a counterfeiting determination requires only *observation.* The seizures in the instant case were executed based upon potential violations of Chapter 25 of Title 18 of the United States Code. To make a finding of probable cause that the relevant statutes were being violated, the issuing magistrate needed to be convinced of only three facts: 1. that the bills were made or executed in whole or in part after the similitude of United States obligations, 18 U.S.C. § 474 para. 5; 2. that the bills were color reproductions, 18 U.S.C. § 504(1); and, 3. that they were more than three-fourths or less than one and one-half the size of actual United States currency, *id.* No subjective" determinations were required—all the factors can be established with the naked eye. Any law enforcement officer—or even a lay person—who has average familiarity with United States currency could make the necessary observations of similarity, size and color to conclude that Boggs Bills potentially violate the counterfeiting statutes at issue. The concern under-

lying the additional process for obscenity warrants—that a law enforcement officer will use his or her own internal definition of "prurient interest" or "patently offensive" to restrain speech based upon a mere dislike of the speech—is practically nonexistent here. The criteria that renders something as counterfeit does not require reaching a legal conclusion, but rather a factual one. When a determination can be made entirely on observation rather than evaluation, the traditional warrant requirement is sufficient, even when presumptively protected materials are at issue.

Perhaps the most apt analogy to the instant case is not obscenity seizures, but rather warrants issued in child pornography cases where a determination of potential violations of applicable law can be made on the basis of mere observation. The courts have held that probable cause determinations in the child pornography area can be made solely on the basis of affidavits even though potentially expressive speech could be restrained when the affiant is . wrong. "Identification of visual depictions of minors engaging in sexually explicit conduct, in comparison [to the legal determination as to whether materials are obscene], is a factual determination that leaves little latitude to the officers." *United States v. Kimbrough,* 69 F.3d 723, 727–28 (5th Cir.1995); *United States v. Koelling,* 992 F.2d 817, 822 (8th Cir.1993) (noting that while there is some chance of a mistaken seizure, generally, "most minors look like minors and most adults look like adults, and most of the time most law enforcement officers can tell the difference."); *United States v. Smith,* 795 F.2d 841 (9th Cir.1986). The child pornography holdings demonstrate that courts do not require more rigorous procedural safeguards or an adversarial hearing prior to seizure when law enforcement officers have objective and non-evaluative criteria by which to make their determinations. Similarly, in order to demonstrate probable cause in support of the Boggs warrant, all that had to be ascertained was that the bills were in the likeness of United States currency, that they were in color, or that they were of an impermissible size. Such objective criteria obviate the necessity for any-

thing more than the standard Fourth Amendment inquiry required for issuance of a warrant.

■ Substantial deference is given to a magistrates' determination that probable cause exists. . *Massachusetts v. Upton,* 466 U.S. 727, 733, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721 (1984); *United States v. Vaughn,* 830 F.2d 1185, 1187 (D.C.Cir.1987); *United States v. Desantis,* 802 F.Supp. 794, 803 (E.D.N.Y.1992) (noting that a magistrate's finding of probable cause is in and of itself a factor tending to uphold the validity of a warrant). It is this court's conclusion that the information contained in Secret Service Agent Thomas Abraham's Affidavit in Support of Application for Search Warrant ("Abraham Affidavit") provided a legally sufficient basis for the magistrate to issue the warrant authorizing the Pittsburgh search and seizure. In a November 20, 1992 conversation, Boggs admitted to Abraham that, pursuant to "Project Pittsburgh," he had printed $1 million of Boggs Bills and that he would circulate them in Pittsburgh over the next two years. Abraham Affidavit ¶ 17. Having seen Boggs Bills before—specifically, the fifteen Boggs Bills taken in Wyoming— Abraham was able to conclude that they were "sufficiently similar to genuine bills that they satisfy the test of similitude" in violation of 18 U.S.C. § 474 para. 5, that they were color reproductions, and that they were approximately the same size as genuine bills, in violation of 18 U.S.C. § 474, para. 6 and 18 U.S.C. § 504 (printing of photographic likenesses). Abraham Affidavit ¶ 18. This court also holds, based on the above analysis, that the affidavit was, by itself, a legally adequate basis upon which the magistrate could make the probable cause determination. As the warrant was supported by probable cause and did not require additional procedural protections prior to its issuance, this court holds that the Pittsburgh seizure did not violate plaintiff's First Amendment rights.

■ Finally, in challenging the validity of the Pittsburgh seizure, Boggs takes issue with the quantity of Boggs Bills seized, arguing that the Secret Service should have only taken the one or two samples needed for evidentiary purposes. Boggs points to *Huff-*

*man,* 470 F.2d at 392, and *Fort Wayne Books,* 489 U.S. at 63, 109 S.Ct. at 927–28 in support of the proposition that only a single copy of an expressive item should be seized for the purpose of preserving it as evidence for a criminal prosecution. *See also Heller v. New York,* 413 U.S. 483, 492 93 S.Ct. 2789, 2794 (1973). This court concludes that plaintiff's analogy to these cases misses an important distinction between the instant case and the obscenity seizures. A court can properly perform its evaluative function as to whether a given book, film or photograph is obscene with just one or two copies of the suspect material. If other copies exist, the First Amendment dictates that those copies should remain available to the public pending a judicial determination of illegality. In this case, however, each Boggs Bill is sufficiently unique such that individual judicial determinations are required as to whether each one violates the relevant counterfeiting statutes. A review of just a "sample" bill could potentially result in an over-broad determination that all of Boggs' work "in the image of money" violates 18 U.S.C. § 474 and is therefore contraband, even if that is not actually the case. The closer analogy to the obscenity area would be if a bookstore sold several allegedly obscene books or if a theater was showing multiple allegedly obscene movies at one time. In such a case, a seizure could include one copy of each of the suspect items and not contravene the First Amendment, provided that the warrant described the areas to be searched and items to be seized with sufficient particularity. Because the Boggs Bills are sufficiently unique such that individual determinations of their legality must be made, the Secret Service was within its right to seize all of the Boggs Bills, and this court will not apply the *Fort Wayne Books* rule for mass seizures in a context in which it its rationale cannot properly be applied.

B. Boggs' Claim for the Return of the Boggs Bills

▮▮▮ Plaintiff's rationale for challenging the above seizures is that he seeks return of the items currently held by the Secret Service. Boggs accurately notes that the proper remedy for the unconstitutional seizure and retention of property is return of the material. *Huffman,* 470 F.2d at 392; *United States v. Pryba,* 502 F.2d 391, 404 n. 97 (D.C.Cir. 1974). Having now determined that neither the Cheyenne nor the Pittsburgh seizures were improperly authorized or violative of plaintiff's constitutional rights, Boggs may not claim entitlement to the return of the seized items on that basis.

▮▮▮ This court nonetheless elects to address plaintiff's claim for the return of the Boggs Bills. "The general rule is that seized property, other than contraband, should be returned to its rightful owner once the criminal proceedings have terminated." *United States v. Farrell,* 606 F.2d 1341, 1343 (D.C.Cir.1979) (quoting *United States v. La-Fatch,* 565 F.2d 81, 83 (6th Cir.1977); *see also Cooper v. City of Greenwood,* 904 F.2d 302, 304 (5th Cir.1990)). Because the government has declined to prosecute plaintiff in either the District of Wyoming or the Western District of Pennsylvania, the criminal proceedings are effectively terminated, and Boggs has a right (subject to the qualifications described below) to make a claim for the return of his goods.[3] Furthermore, the length of time that has elapsed between the seizures and the government's final decision not to prosecute—almost two years—mitigates in favor of plaintiff's claim for the return of his goods. *See Eckstein v. Cullen,* 803 F.Supp. 1107, 1116 (E.D.Va.1992) (noting that the duration of a seizure implicates the First Amendment when expressive materials are at issue); *United States v. Premises Known as 608 Taylor Avenue, Apartment 302,* 584 F.2d 1297, 1302 (3d Cir.1978) (stating that the government can retain possession for only a reasonable time).

▮▮▮ Whether or not Boggs is entitled to the return of his art turns on this court's

---

3. To the best of this court's knowledge, plaintiff has not filed a motion pursuant to Federal Rule of Criminal Procedure 41(e) for the return of his property in either the District of Wyoming or the Western District of Pennsylvania. As the govern- ment has not challenged plaintiff's bringing his claim for the return of the seized items in this court, this court will operate under its equitable power in determining whether the property should be returned.

determination as to whether the Boggs Bills are contraband. Individuals have no property right in contraband materials and contraband materials may not be returned to them. *United States v. Jeffers,* 342 U.S. 48, 52, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951); *Trupiano v. United States,* 334 U.S. 699, 710, 68 S.Ct. 1229, 1234–35, 92 L.Ed. 1663 (1948). Notably, this is true whether or not the initial seizure of the property was improper, and whether or not any person connected with the seizure has been convicted of a crime. *Id.*

▆▆▆▆ Contraband is divided into two types. The first is "contraband *per se,*" which are objects that are inherently unlawful to possess, such as cocaine and other illegal narcotics. "[O]ne cannot have a property right in that which is not subject to legal possession." *City of Greenwood,* 904 F.2d at 304–05. For contraband *per se,* no forfeiture action need be filed for the government to retain the items; the government owns the items upon seizure. *United States v. 37.29 Pounds of Semi–Precious Stones,* 7 F.3d 480, 485 (6th Cir.1993).

▆▆▆▆ Derivative contraband, on the other hand, are items that are not inherently unlawful but become unlawful based upon the use(s) to which they have been put. An automobile used in furtherance of a felony is the paradigm example of derivative contraband. *See, e.g., One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 699–700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965). Derivative contraband may only be forfeited pursuant to a statute, and such statutory forfeitures require notice and an opportunity to be heard. *See Degen v. United States,* 517 U.S. 820, ——, 116 S.Ct. 1777, 1780, 135 L.Ed.2d 102 (1996); *United States v. James Daniel Good Real Property,* 510 U.S. 43, 48–62, 114 S.Ct. 492, 498–504, 126 L.Ed.2d 490 (1993). Absent statutory authority for the forfeiture of derivative contraband, it must be returned, as there is no authority for the

continued detention of the item by the government. *United States v. Wilson,* 540 F.2d 1100, 1104 (D.C.Cir.1976). Statutory authorization for the forfeiture of counterfeit paraphernalia is found in 18 U.S.C. § 492.

Consequently, the question that must be resolved is as to whether the Boggs Bills[4] are either contraband per se, derivative contraband or non-contraband. In *Boggs v. Bowron,* this court expressly stated that "[n]o determination has been made as to whether any items within the portfolio [the samples from Wyoming] constitute contraband." *Boggs v. Bowron,* 842 F.Supp. at 561 n. 42. At that time, such a decision would have been premature, as no final determination had been reached as to whether plaintiff would be prosecuted. Now that the United States Attorney has decided not to prosecute in either jurisdiction, the court will consider whether the Boggs Bills are contraband and therefore automatically forfeited to the government, or should be returned to the plaintiff. For reasons that will become apparent below, this court will analyze the samples seized in Cheyenne separately from those seized in Pittsburgh.

1. The Cheyenne Boggs Bills

▆▆▆▆ In *Boggs v. Bowron,* this court had the opportunity to examine the fifteen samples that Boggs relinquished in Wyoming. The court found that those Boggs Bills were in "the general pattern of general currency, including portraits in the middle, federal reserve seals and numbers, treasury seals and numbers, signature blocks and numeric features, in the size and color similar to genuine currency." *Boggs v. Bowron,* 842 F.Supp. at 561. The court further concluded "that a jury would be justified, if not compelled, to find that these items were in the likeness and similitude of genuine United States currency." *Id.*

4. The government has already agreed to return all of the "noncontraband" items seized in Pittsburgh. *See* Letter from Charles F. Flynn, Assistant United States Attorney, to Kent A. Yalowitz, Esq. (April 14, 1995). Plaintiff's counsel, on the other hand, is "of the view that all of the property seized must be viewed as a whole in any civil forfeiture action ..." Letter from Kent A. Yalowitz to Charles F. Flynn (March 9, 1995). As the only item(s) contested in this action are the Boggs Bills that the Secret Service claims are contraband, the court will limit its analysis to those items.

These conclusions from *Boggs v. Bowron* are binding on the court in the instant case. Having determined that a jury would be compelled to find that the fifteen Cheyenne Boggs Bills violate 18 U.S.C. § 474, para. 5, which proscribes the possession or custody of items made or executed after the similitude of United States obligations, the court must now rule that those bills are contraband *per se.* Counterfeit bills are among the most obvious forms of contraband as their mere possession, without more, is unlawful. *See 37.29 Pounds of Semi–Precious Stones,* 7 F.3d at 485. The instant case is precisely the type of situation that the contraband *per se* forfeiture rule is intended to address. If mere possession of an item is a crime, the government's return of that item would make the recipient a criminal, and a court cannot enter an order that would lead to such a result.

Based upon its factual conclusions from *Boggs v. Bowron,* this court must now hold that the fifteen Boggs Bills seized in Cheyenne are contraband *per se.* Consequently, they are hereby forfeited to the United States without forfeiture procedures.

2. The Pittsburgh Boggs Bills

 This court may not rely on the holding in *Boggs v. Bowron* to conclude that the Boggs Bills [5] seized in Pittsburgh are contraband, as these bills had not been previously examined by this court. As explained in Part II.A.2., the Boggs Bills are sufficiently unique such that individual determinations as to whether they violate 18 U.S.C. §§ 474, 481, 504 and 31 C.F.R. § 411.1 are required. The Secret Service contends that this court's examination of the seized items "would lead the Court to conclude from its own observation that the reproductions are in the likeness and similitude of genuine United States currency." Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment at 4. Defendants, in their briefing of this matter, "invited" this court to examine the Boggs Bills and rule on the basis of its own observa-

tions. The court "accepted" this "invitation," and conducted an *in camera* review of all of the Pittsburgh materials on October 23, 1997.

Having examined all of the disputed Boggs Bills seized in Pittsburgh (Exhibits B, C, and D from Defendant's In Camera Submission and Declaration of Counterfeit Specialist Richard L. Outland), this court concludes that all of the items that the Secret Service contends are contraband are, to this court's satisfaction, reproductions of genuine currency of the United States or reproductions of genuine foreign currency. Each are in the likeness and similitude of genuine currency and therefore in violation of 18 U.S.C. §§ 472 or 481. Each reproduction has the general design and appearance of genuine United States or foreign currency. None of the pieces in dispute meet the size and coloration exemptions of 18 U.S.C. § 504 and 31 C.F.R. 411.1. This court is therefore compelled to hold that items 1, 2 and 56 of the 81 reproductions of item 5 in Exhibit B are contraband; that items 1, 2, 3, 4, 5, and 6 in Exhibit C are contraband; and that items 1, 4, 5, 8, 13–16, 18, 19, 22–24 and the novelty items (except the oversize $2 note) from Exhibit D are contraband. These items are therefore forfeited to the United States without the necessity of forfeiture procedures.

---

5. A few of the items seized in Pittsburgh were not actual "bills", but rather "novelty items," including calculators, air fresheners and a bow tie. These items were also inspected to deter-

mine whether they violated the applicable counterfeiting statutes. For the purpose of convenience, they will be referred to under the general heading of "Boggs Bills."